JAMES B. LEAHY AND KATHLEEN S. LEAHY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 9475-84, 9488-84.     Filed July 3, 1986.

*Lawrence A. Chez*, *Matthias A. Lydon* and *Roman L. Sukley*, for the petitioners.

*Lauren W. Gore*, for the respondent.

GERBER, *Judge*: Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1978 and 1980 of $177,974 and $36,564, respectively. Respondent also determined additions to tax under section 6653(a)[1] for the taxable years 1978 and 1980 in the amounts of $11,736 and $6,906, respectively. With respect to the taxable year 1980, respondent determined an addition to tax under section 6651(a) in the amount of $5,469. The parties have filed a stipulation of settled issues which purports to resolve all but one adjustment common to both the 1978 and 1980 taxable years in these consolidated cases.[2] The issue remaining in controversy is whether a limited partner is entitled to claim a proportionate share of the partnership's claimed depreciation and investment tax credit in connection with a movie entitled "Overboard."

## FINDINGS OF FACT

This case was submitted fully stipulated and the stipulation of facts and exhibits are incorporated by this reference. Petitioners James and Kathleen Leahy maintained their legal residence in Palos Heights, Illinois, at the time of filing both petitions in these consolidated cases. Petitioners filed their joint U.S. Individual Income Tax Return (Form 1040) for the taxable years 1978 and 1980 with the Internal Revenue Service Center at Kansas City, Missouri. The Service Center received the 1978 return on June 2, 1980, and the 1980 return on November 4, 1981. Notices of deficiency, dated January 11 and January 24, 1984, were

---

[1]All statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in question, and all Rule references are to the Rules of Practice and Procedure of this Court.

[2]The parties have agreed that petitioners are not liable for the addition to tax under sec. 6653(a) for the taxable years 1978 and 1980. The parties, however, have not stipulated with respect to the addition to tax for the 1980 taxable year under sec. 6651(a).

issued to petitioners concerning their income tax liability for petitioners' 1978 and 1980 taxable years, respectively.

The remaining issue presented for our consideration concerns James B. Leahy's (petitioner's) involvement as a limited partner in Lorelei Productions, Ltd. (Lorelei), an Illinois limited partnership organized May 31, 1978. Lorelei was organized "to acquire, own, license, distribute, sell and otherwise exploit motion pictures, television productions and other entertainment products."

Lorelei had one general partner, Homer J. Askounis, who contributed $100 of capital to the partnership. Petitioner was one of six limited partners who collectively contributed $195,000 of capital to Lorelei. Other than the $195,000 and $100 referenced above, neither the general partner nor the limited partners were required to make additional capital contributions. Petitioner's contribution to Lorelei was composed of a cash payment of $12,870 on August 11, 1978, and two irrevocable letters of credit, each in the amount of $7,500, which were due on June 30, 1979, and June 30, 1980, respectively. On or about May 31, 1978, Lorelei entered into a Motion Picture Purchase Agreement with Factor Newland Production Corp. (Factor), which recited that Lorelei was to acquire the motion picture photoplay "Overboard," including the negative and color reversal internegative. Legal title and copyright to the photoplay was to be held by and registered in Factor's name until assignment was requested by Lorelei, but the assignment could not be requested until after the domestic broadcast of the movie "Overboard." The agreement indicated that Factor held the copyright in trust for Lorelei. The agreement granted to Lorelei, among other rights, the right to all benefits of the agreements which had already been made with National Broadcasting Co.(NBC) and Time-Life Films, Inc. (Time-Life).

Factor was incorporated in California on December 22, 1976. In October 1977, Factor obtained the photoplay rights to the novel *Overboard*, written by Hank Searls. About a month later, Factor entered into an agreement with NBC granting NBC exclusive right to broadcast an initial run and one rerun (within 3 years) of the delivery of the movie "Overboard." Delivery was to occur on or before August 15,

1978. In exchange, NBC was to pay Factor $1,190,000, consisting of a $975,000 flat fee and $215,000 representing reimbursement for fees paid to movie stars Angie Dickinson and Cliff Robertson. The $1,190,000 was to be paid in installments with an agreed amount advanced at the time the program was ordered and one-third of the balance advanced at the time of the commencement of photography, completion of photography, and 10 days after delivery of the program to NBC.

On or about June 13, 1978, Factor entered into a distribution agreement with Time-Life wherein Time-Life was granted the distribution rights to the movie for a term of 20 years, essentially from the date the NBC license expired. In exchange, Time-Life agreed to pay Factor a $300,000 advance against Factor's share of the gross receipts, payable $125,000 upon delivery of the movie to Time-Life, $58,334 when the NBC license expired, and $58,333 both 1 year after and 2 years after the NBC license ended. The Time-Life agreement required the following distribution of gross receipts. First, Time-Life was to retain its distribution charges and expenses, thereafter Time-Life was entitled to recoup all advances paid to Factor and any remaining balance of gross receipts was to be paid to Factor. At the end of the 20-year period, Time-Life had an option to renew for an additional 20 years by means of written notice to Factor. If renewed, the earliest date on which the distribution agreement would expire is the year 2019.

Pursuant to the May 31, 1978, agreement, Lorelei was to pay Factor $2,390,000 for the movie "Overboard." The $2,390,000 was to be payable as follows:

| | |
|---|---|
| $50,000 | On execution of agreement |
| 1,315,000 | On delivery of film to NBC |
| 50,000 | One year from date of agreement |
| 50,000 | Two years from date of agreement |
| 87,500 | One year after date of delivery to NBC |
| 87,500 | Two years after date of delivery to NBC |
| 150,000 | Payable only out of 75 percent of net proceeds |
| 200,000 | Payable only out of 75 percent of net proceeds |
| 400,000 | Payable only out of 75 percent of net proceeds |
| 2,390,000 | |

Any "net profits" after payment of the $2,390,000 were to be divided 25 percent for Lorelei and 75 percent for Factor.[3]

On or about July 9, 1979, Lorelei and Factor executed an amendment which changed the payment schedule in the following manner. Instead of $1,315,000 being payable at the time of delivery of the film to NBC, only $1,190,000 was payable upon such event and the remaining $125,000 was not payable until delivery of the film to Time-Life. The other change to the payment schedule added a $58,334 payment when the NBC license period was to expire and reduced the $87,500 payments made 1 year and 2 years after delivery to NBC to $58,333 each. None of these changes would have affected the total amount due under the agreement; only the amount and timing of payments were varied slightly.

---

[3] "Net profits" are defined in the "May 1978 Lorelei agreement," as follows:

3(b) * * *

(i) From the total revenues (hereinafter referred to as "net revenues") paid by Time-Life * * *, [Factor] shall first recoup any liability for residuals payments which [Factor] incurs for network runs of the Photoplay beyond the first two network runs to the extent that [Factor's] total liability for residuals payments is increased as a result of subsequent runs of the Photoplay after the first two network runs being network runs rather than syndication runs. There shall then be deducted the next $75,000.00 received, which sum shall be retained by [Lorelei].

(ii) The balance of net revenues paid by Time-Life after [Factor] has recouped any additional residuals liabilities for subsequent network runs after the first two network runs and [Lorelei] has retained $75,000.00 shall be deemed "net proceeds".

(iii) [Factor] shall receive the first $59,500.00 of net proceeds, which sum [Factor] shall pay to the William Morris Agency.

(iv) The next $100,000.00 of net proceeds shall be divided as follows: [Lorelei] shall receive forty percent (40%) and [Factor] shall receive sixty percent (60%).

(v) All further net proceeds shall be divided as follows: [Lorelei] shall receive twenty-five percent (25%) and [Factor] shall receive seventy-five percent (75%).

(vi) The next $150,000.00 of net proceeds which [Factor] receives shall be payment of the sum due to [Factor] under Paragraph 3(a)(vii).

(vii) The next $200,000.00 of net proceeds which [Factor] receives shall be payment of the sum due [Factor] under Paragraph 3(a)(viii).

(viii) The next $400,000.00 of net proceeds which [Factor] receives shall be payment of the sum due [Factor] under Paragraph 3(a)(ix).

(4) DIVISION OF NET PROFITS:

(a) After [Factor] and [Lorelei] have receive [sic] all net proceeds due them under Paragraph 3(b), all further net revenues paid by Time-Life shall be deemed "net profits." All net profits shall be divided between [Lorelei] and [Factor] as follows: [Lorelei] shall receive twenty-five percent (25%) of all net profits and [Factor] shall receive seventy-five percent (75%) of all net profits.

* * * * * * *

(c) [Factor] shall be entitled to seventy-five percent (75%) and [Lorelei] shall be entitled to twenty-five percent (25%) of all foreign tax credits due in connection with the proceeds derived from the Photoplay outside the United States.

Factor delivered the film to NBC about August 7, 1978, and the first network broadcast occurred September 25, 1978. NBC aired the film a second time on September 3, 1979.

Under the motion picture purchase agreement, Lorelei could not enter into any distribution agreements without the consultation and approval of Factor. Lorelei was not a party to either the NBC license agreement dated November 21, 1977, or the Time-Life agreement dated June 13, 1978. Further, Lorelei did not directly pay any portion of the production costs of the movie. The actual production costs were incurred by Factor in the amount of $1,487,445. All payments made by NBC and Time-Life under the respective agreements were either made directly to Factor or to Factor through the William Morris Agency.

Lorelei was organized with six limited partners, one of whom was petitioner, and one general partner named Homer J. Askounis. Unlike the six limited partners whose capital contributions ranged between $19,500 and $43,875 (for a total capital contribution of limited partners in the amount of $195,000), Mr. Askounis made a capital contribution of only $100. Even though designated as a general partner, Mr. Askounis did not play a role in the negotiation of the motion picture purchase agreement between Lorelei and Factor, and his involvement with Lorelei was limited to the execution of documents, including the partnership returns of Lorelei, as general partner.

Lorelei's checking account was opened on August 4, 1978, with an attorney, Robert Greenberg (who was not a partner), and Edward B. Chez (who was not a partner and was one of the accountants to Lorelei) as signatories. Attorney Greenberg, in 1978, had contacted Mr. Askounis to serve as Lorelei's general partner. Further, attorney Greenberg made three contacts during 1978 resulting in the purchase of three interests as limited partners in Lorelei. Accountant Chez contacted petitioner and two other limited partners. Accordingly, although attorney Greenberg and accountant Chez did not become active participants in Lorelei, they were the "promoters."

NBC made payments to Factor, through the William Morris Agency, as follows:

| Date | Amount | Purpose |
|------|--------|---------|
| Nov. 16, 1977 | $25,000.00 | Film rights costs |
| Jan.  5, 1978 | 17,599.90 | Script draft |
| Feb. 28, 1978 | 11,841.00 | Final script |
| Feb. 15, 1978 | 100,000.00 | Pre-production advance |
| Mar. 15, 1978 | 363,333.34 | Commencement of principal photography |
| Mar. 31, 1978 | 33,333.33 | Balance of principal photography |
| Apr. 14, 1978 | 330,000.00 | Completion of principal photography |
| Aug.  7, 1978 | 308,892.43 | Film delivery |
| Total | [4]1,190,000.00 | |

On its returns (Forms 1065) for the taxable years 1978, 1979, and 1980, Lorelei reported the following amounts of gross receipts from the sources indicated:

| *1978* : | NBC license fee | $1,190,000 |
|----------|-----------------|------------|
| | Time-Life fee | 125,000 |
| | | 1,315,000 |
| *1979* : | Time-Life fee | 87,500 |
| *1980* : | Time-Life fee | 87,500 |

Partnership returns of income were filed for Lorelei's 1978, 1979, and 1980 taxable years under the cash method of accounting reflecting the following amounts of gross receipts, depreciation, ordinary income or loss and the basis of property for which investment tax credit was being claimed:

| Taxable year | Gross receipts | Total depreciation claimed | Ordinary income (or loss) | Basis of property claimed as qualifying for investment tax credit |
|--------------|----------------|----------------------------|---------------------------|-------------------------------------------------------------------|
| 1978 | $1,315,000 | $1,287,766 | $12,170 | $1,348,844 |
| 1979 | 87,500 | 85,688 | (7,624) | 44,395 |
| 1980 | 87,500 | 85,688 | 469 | - - - |

---

[4] Respondent's brief reflected total payments from NBC of $1,190,000.93, but the sum of the numbers presented was only $1,189,999.43. The exhibits stipulated by the parties varied from respondent's brief, which was not objected to by petitioners on this point, as follows: (1) Jan. 5, 1978, check was $17,599.00 and should have been $17,599.90; (2) Aug. 7, 1978, check was $308,892.76 and should have been$308,892.43. After substituting the correct amounts, the sum total becomes $1,190,000,00, the same amount reflected on the Forms 1065 by Lorelei.

Petitioner, in connection with his investment in Lorelei, of $12,870 in cash and $15,000 in irrevocable letters of credit (for a total of $27,870 which represented a 14.85-percent interest in Lorelei), reported the following income (loss) and investment tax credits for the taxable years 1978, 1979, and 1980:

| Taxable year | Income or (loss) | Investment tax credit |
|---|---|---|
| 1978 | $1,807 | $20,028 |
| 1979 | [5](1,132) | [6]659 |
| 1980 | 70 | - - - |

## OPINION

The sole question remaining for our consideration is respondent's disallowance of depreciation and investment tax credit in connection with petitioner's investment, as one of six limited partners, in a partnership (Lorelei). Lorelei was organized to exploit motion pictures. Lorelei entered into an agreement with Factor, a motion picture producer, to exploit the movie "Overboard." In the statutory notices,[7] respondent provided the following reasons for disallowance: (1) Lack of "actual" ownership interest in the movie; (2) loans are too contingent and lack economic substance to be considered part of the depreciable basis in the movie; (3) the fair market value of the movie has not been established in an amount which would support the amount of the "loans" for purposes of limited partner's basis; (4) "the partnership's method of depreciation does not bear a proper relationship to the decline in the usefulness of the movie"; and (5) claimed amortization is not allowable because (a) amount used as basis was not paid, or if paid not amortizable, and (b) the obligation underlying the claimed amortizable asset was either not petitioners' or was subject to a contingency.

---

[5] This figure was extrapolated from Schedule K-1 for petitioner and part of Lorelei's 1979 Form 1065 which reflects $6,593 in property subject to investment tax credit.

[6] This figure was taken directly from Schedule K-1 for petitioner.

[7] One statutory notice, issued Jan. 24, 1984, concerned petitioners' 1978 taxable year. The other notice, issued Jan. 11, 1984, concerned petitioners' 1980 taxable year. The 1980 notice contained explanatory paragraphs concerning the Lorelei disallowances, whereas the 1978 notice designated the specific amounts of disallowance, without express explanatory paragraphs.

On brief, respondent advanced the additional ground that neither Lorelei nor petitioners attached the statement required by section 1.48-8(g)(3), Income Tax Regs., as a prerequisite to enablement to claim the investment tax credit for a movie purchased after January 19, 1978.[8] Respondent, also on brief, abandoned reliance upon the fair market value, economic substance, contingency of indebtedness or income stream, and method of depreciation bases for disallowance. Respondent's remaining positions for disallowance of depreciation, amortization, and investment tax credit are failure to comply with requirements of section 1.48-8(g)(3), Income Tax Regs., and that the partnership did not acquire an ownership interest in the movie which would entitle its partners to claim depreciation or investment tax credit.

### Timeliness of Respondent's Sec. 1.48-8(g)(3), Income Tax Regs., Position

This Court has on numerous occasions addressed the timeliness of a party's attempt to raise a new position.[9] It is within our discretion to permit a new issue or ground if we find that the opposing party is not prejudiced by such permission. *Commissioner v. Erie Forge Co.*, 167 F.2d 71, 74-75 (3d Cir. 1948), affg. a Memorandum Opinion of this Court; *Law v. Commissioner*, 84 T.C. 985, 992 (1985); *Estate of Horvath v. Commissioner*, 59 T.C. 551, 555-556 (1973).

Of key importance in evaluating the existence of prejudice is the amount of surprise and the need for additional evidence on behalf of the party in opposition to the new position. To be sure, petitioners were surprised to learn of respondent's "regulation position" on brief, due to its absence from the statutory notices and the pleadings. In this case, the parties submitted the case with the facts fully stipulated and presumably with an understanding of the

---

[8] Our ultimate finding that Lorelei did not purchase the movie, but instead joined the producer in a joint venture, would appear to obviate the need to comply with sec. 1.48-8(g)(3), Income Tax Regs., because there was no purchase of the qualified film "by taxpayer other than original owner."

[9] There is no need to consider whether respondent's position is merely a new theory which clarifies or develops respondent's original determination (*Estate of Scharf v. Commissioner*, 38 T.C. 15, 27-28 (1962), affd. 316 F.2d 625 (7th Cir. 1963)), or a new matter, for which respondent would bear the burden of proof (*Achiro v. Commissioner*, 77 T.C. 880, 890 (1981)), because of our ultimate conclusion regarding respondent's timeliness in raising this position.

legal issues to be presented and defended. Respondent raised numerous grounds for disallowance by statutory notice, which would have come within the presumption of correctness afforded respondent, *Welch v. Helvering*, 290 U.S. 111, 115 (1933), and respondent had several other opportunities to raise new issues or grounds. *Seligman v. Commissioner*, 84 T.C. 191, 198 (1985).[10]

Respondent's new position is that Lorelei's and petitioners' failure to comply with section 1.48-8(g)(3), Income Tax Regs., by not attaching a statement to returns which are the subject of this case would prohibit petitioners from claiming the investment tax credit with respect to the movie. Respondent raises this ground after raising more than five in the statutory notice and refining the major thrust, on brief, to one of the original grounds and the proposed new ground. The longer respondent delays in disclosing theories, "the more reason there is to conclude that the taxpayer has not received fair notice and has been * * * prejudiced." *Commissioner v. Transport Mfg. & Equip. Co.*, 478 F.2d 731, 736 (8th Cir. 1973). This is especially true here, where there was no trial and the facts were fixed by agreement. Compare *Stewart v. Commissioner*, 714 F.2d 977 (9th Cir. 1983), affg. a Memorandum Opinion of this Court. Accordingly, we hold that petitioners were surprised by the new ground and their ability to present their case was prejudiced. *Seligman v. Commissioner, supra*; *Estate of Horvath v. Commissioner, supra* at 556; *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. 601, 617 (1964).

### Entitlement to Depreciation and Investment Tax Credit

We are convinced that the movie "Overboard" is an asset for which depreciation and investment tax credit may be available to its owner. Indeed, "Overboard" was a successful movie which had been licensed to NBC and Time-Life Films for more than a 20-year period in exchange for fixed periodic payments that would total $1,490,000. The $1,490,000 were minimum payments and additional royalties

---

[10] It seems ironic that respondent seeks to defeat petitioner for failure to comply with the procedural portion of a regulation which respondent failed to raise during the audit, issuance of the notice of deficiency, filing of an answer or submission of the case for our consideration.

or license fees would be paid to the extent that Time-Life recouped its distribution charges, expenses, and the $300,000 advanced for the license. The only question we are asked to decide is whether petitioner, through his limited partnership interest in Lorelei, was an "owner" of the movie "Overboard" so as to be entitled to claim both depreciation and investment tax credit in connection with the investment.

Respondent does not question the value or bona fides of the subject matter, but only whether Lorelei acquired an ownership interest. Although respondent has broken the question of entitlement to depreciation and investment tax credit into two separate arguments, we find it more convenient to discuss them together. Accordingly, we shall analyze to what extent, if any, ownership of the movie transferred from the producer, Factor, to Lorelei.

Petitioner asserts that the transfer was achieved by means of a sale. A sale is a transfer of property for money or a promise of payment. *Commissioner v. Brown*, 380 U.S. 563, 570-571 (1965). For purposes of Federal taxation, a sale occurs upon the transfer of the benefits and burdens of ownership, rather than upon the satisfaction of the technical requirements for the passage of title under State law. *Houchins v. Commissioner*, 79 T.C. 570, 590 (1982); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981).

The consideration of whether the benefits and burdens have been transferred is essentially a factual determination and as outlined in *Houchins v. Commissioner, supra* at 591,

is to be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances. *Grodt & McKay Realty, Inc. v. Commissioner, supra*. Among the factors to be considered in making this determination are: (1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation or disposition of the property. See *Grodt & McKay Realty, Inc. v. Commissioner, supra* at 1237-1238. * * * [Fn. ref. omitted.]

The passage of title to a motion picture is accomplished through the transfer of both the negative and copyright. The basic principles to be considered were outlined and set forth in *Tolwinsky v. Commissioner*, 86 T.C. 1009, 1041-1043 (1986), as follows:

Ownership of a motion picture negative is distinct from ownership of the copyright thereto (17 U.S.C. sec. 202 (1982) (effective Jan. 1, 1978); *Michael Todd Co. v. Los Angeles County*, 57 Cal. 2d 684, 371 P.2d 340, 21 Cal. Rptr. 604 (1962), and cases cited therein), and ownership of the former without possession of at least certain of the rights encompassed by the latter is commercially valueless. See *Misbourne Pictures Ltd. v. Johnson*, 189 F.2d 774, 776 (2d Cir. 1951). Copyrights are monopolies; "they entitle the owner to prohibit various kinds of reproduction, and to relieve individuals of these prohibitions by licenses." *Goldsmith v. Commissioner*, 143 F.2d 466, 467 (2d Cir. 1944) (L. Hand, J., concurring), affg. on other grounds 1 T.C. 711 (1943). The exclusive rights that comprise the so-called "bundle of rights" that is a copyright in a motion picture are detailed in 17 U.S.C. sec. 106 (1982):

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of * * * motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

(5) in the case of * * * the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

Each of the five rights comprising the copyright may be subdivided indefinitely, and under copyright law, each subdivision of an exclusive right may be owned and enforced separately. 17 U.S.C. sec. 201(d) (1982).

For tax purposes, a sale of a motion picture occurs when there is a transfer of all substantial rights of value in the motion picture copyright. *Carnegie Productions, Inc. v. Commissioner*, 59 T.C. 642 (1973) (Court-reviewed); * * *. No sale occurs if the transferor retains proprietary rights in the motion picture. See *Carnegie Productions, Inc. v. Commissioner, supra* at 653; *Cory v. Commissioner*, 23 T.C. 775 (1955), affd. 230 F.2d 941 (2d Cir. 1956). * * * [Fn. refs. omitted.]

See also *Law v. Commissioner*, 86 T.C. 1065 (1986).

After thorough consideration of the facts and circumstances of this case we find that Lorelei and its partners became a joint venturer with a 25-percent interest in the film "Overboard."

Factor acquired a script or screenplay and produced a movie at a cost of $1,487,445. During November 1977, Factor entered into an agreement to license NBC to televise the movie 2 times over a 3-year period for $1,190,000. During May 1978, Factor and Lorelei entered into their agreement. During June 1978, Factor entered into an agreement to license to Time-Life the rights to the movie without geographical limitation, except for "French Polynesia," for a 20-year renewable period, basically beginning at the end of NBC's license. Time-Life's license did not include the theatrical rights. In exchange, Time-Life was to pay Factor an advance of $300,000 (payable over about 5 years) and the balance of any gross receipts after reduction for Time-Life distribution charges, expenses, and any advances paid to Factor.

Under the May 1978 agreement between Lorelei and Factor, Lorelei was to receive the (photoplay) movie subject to the NBC and Time-Life licenses, which, in effect, conveyed Factor's retained right to use the photoplay for theatrical purposes.[11] Further, Lorelei was to receive the $1,190,000 due from NBC, the $300,000 advance from Time-Life, and approximately 25 percent of the "net profits" from the amounts originally payable to Factor by Time-Life. The purchase price to be paid by Lorelei was stated as $2,390,000. Of the $2,390,000 purchase price, $1,640,000 was payable upon specified dates or occurrences and not dependent upon the existence of "net [profits]." The remaining $750,000 was only payable to Factor if "net [profits]" were realized. Further, the $750,000 was payable to Factor as its part of a split (75 percent Factor—25 percent Lorelei) of the residue, after all other expenses and charges are paid.

It is no coincidence that the $1,640,000 unconditional portion of the purchase price is exactly equal to the total of the unconditional payments to be made by NBC ($1,190,000), Time-Life ($300,000) and the "cash investment" of Lorelei limited partners attributable to the movie ($150,000).[12]

---

[11] No evidence was supplied regarding the value of the theatrical rights or whether there was an intention to use or any actual use of the theatrical rights to "Overboard."

[12] It is also more than coincidental that the "purchase price" to be paid by Lorelei ($2,390,000) provided sufficient depreciation in each of the 3 years before the Court to limit the taxable income or loss from the movie to less than 1 percent of the gross receipts from NBC and Time-Life. Accordingly, limited partners reported a nominal amount of gain or loss, but claimed an investment tax credit approximating 75 percent of their cash investment.

It is also most curious and revealing that the $1,640,000 unconditional portion of the purchase price to be paid by Lorelei is nearly[13] equal to Factor's production cost ($1,487,445) plus the "cash investment" of the Lorelei limited partners. Accordingly, after consideration of all unconditional payments, as between Factor and Lorelei, only Lorelei is "out of pocket" ($150,000) and Factor has received a markup of approximately 10 percent on production costs. Beyond the $150,000, the limited partners of Lorelei have no personal or partnership obligations, unless the license agreement with Time-Life produces revenues in excess of charges, expenses of distribution, and advances. If an excess occurs, that excess revenue will provide the sole source of payment under the agreements to satisfy any of Lorelei's obligations over $150,000.

To the extent that the Time-Life license does produce excess revenue, Factor is to receive 75 percent and Lorelei is to receive 25 percent. As previously indicated, the $750,000 "conditional portion" of the purchase price to be paid by Lorelei is to be part of Factor's 75-percent split. Once the $750,000 is received by Factor, all further "net profits" are to be split 75 percent for Factor and 25 percent for Lorelei. Accordingly, to the extent that the movie was successful beyond the $1,490,000 to be received from NBC and Time-Life, Lorelei and Factor were "partners" or they jointly ventured to share profits from the exploitation of the photoplay.

Factor and Lorelei did stand to share losses in a similar ratio to profits. The ratio in which losses would have been borne is not defined but in effect would be similar to the 75-to 25-split of profits. From the first "excess revenues" to be received from Time-Life, Lorelei was to receive $75,000, only, preceded by any residuals that Factor may have been obligated to pay regarding the televising of the movie. Thereafter, Factor was to receive $59,500, which was payable to the William Morris Agency. Then Lorelei was entitled to $40,000 of the next $100,000. At this point, Lorelei is on a par with Factor to the extent that both are

---

[13] Factor's production costs ($1,487,445) plus the Lorelei "cash investment" ($150,000) is less than one-seventh of 1 percent short of the $1,640,000 unconditional payments to be made by Lorelei.

relatively "cashed-out" of the transaction and thereafter they begin sharing profits at the 75 to 25 split. Accordingly, Lorelei stood to lose its $150,000, which it put up on the front end and Factor stood to lose its $750,000, receipt of which was deferred at least until after 3 years, if the Time-Life license did not return a profit. Although $750,000-$150,000 does not mathematically equate to a 75 to 25 split, the ratio would more closely approach 75 to 25 if one considers the timing and nature of the two amounts. Lorelei paid the $150,000 at the outset and stood to lose that amount if the venture was unsuccessful.[14] On the other hand, Factor was "guaranteed" $750,000 as part of a designated division of profits which it would "lose" if the movie were unsuccessful. That amount relates to Factor's investment of labor and time in the production of the movie, which represents its portion of the investment in the venture to exploit the photoplay.[15]

Although the legal title to the copyright was held and registered in Factor's name, Lorelei was entitled to have it registered in its name after the first showing by NBC. The agreement recited that Factor held the title "in trust" for Lorelei and that it would be assigned upon Lorelei's "request made at any time after the first domestic syndication broadcast of the Photoplay."[16] Even if Lorelei had requested assignment of the copyright, there remained sufficient restriction upon its use (because of the NBC and Time-Life licenses) and control by Factor so as to require the consent or participation of both Factor and Lorelei to exploit or profit from the movie.

If the agreement between Lorelei and Factor is to be respected, Lorelei, at very least, received a shared interest in the photoplay. In addition to the NBC license and potential theatrical rights, Lorelei acquired a 25-percent interest in the profits from the Time-Life license, which license could have produced revenues over a 40-year period, after which the distribution rights would have reverted back to Factor and Lorelei. We must assume that NBC and Time-Life would not pay over or advance nearly $1.5 million

---

[14] This analysis does not consider possible tax benefits which are the subject of this case.

[15] Surely the $150,000 amount received (approximately 10 percent of the production costs) would not adequately compensate Factor for production and marketing of the movie.

[16] The record is silent as to whether Lorelei ever requested assignment of the copyright.

for a license unless it had promising potential. If unsuccessful, Lorelei would lose its $150,000 investment and Factor its time and effort in the production, beyond the $150,000 received from Lorelei.

At the time of the "May 1978 Lorelei agreement" the NBC license had been contracted for and the Time-Life license agreement was likely under consideration. Moreover, the production of the photoplay was not complete and Factor received part of the consideration from Lorelei which was available for use by Factor to pay for part of the $1,487,445 production costs.

Considering the foregoing, we are convinced that the movie was a viable property and that Lorelei had acquired an ownership interest that would entitle its limited partners to claim both depreciation and investment tax credit. We do not find, however, that the ownership interest was acquired, as alleged, by means of a purchase and sale of the photoplay. This transaction was not a transfer of property for money or a promise of payment. *Commissioner v. Brown*, 380 U.S. 563 (1965). Instead, the transaction is one where Lorelei was permitted to join the owner of a photoplay and producer of a movie to jointly own, exploit, and participate in the profits from the subject asset. Factor did not give up all of its interest nor did Lorelei acquire unfettered right, but rather the parties now share the asset in a joint venture. See *Podell v. Commissioner*, 55 T.C. 429, 431 (1970), and cases cited therein. Further, their joint venture falls within the definition of a partnership for Federal income tax purposes. *Long v. Commissioner*, 77 T.C. 1045, 1064-1065 (1981). The facts of this case are distinguishable from those set forth in *Tolwinsky v. Commissioner*, 86 T.C. 1009 (1986), and *Law v. Commissioner*, 86 T.C. 1065 (1986).

It is well established that the economic substance of a transaction, rather than its form, controls for Federal tax purposes. *Gregory v. Helvering*, 293 U.S. 465 (1935); *Derr v. Commissioner*, 77 T.C. 708 (1981). We must be concerned with the economic realities and not necessarily the form employed by the parties. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978); *Estate of Franklin v. Commissioner*, 64

T.C. 752 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976).

As important, we should not disregard the existence of an asset for which Congress intended tax advantages merely because the parties attempted to maximize the advantage of those benefits for one of the parties to a transaction. Respondent should recognize that in instances where there are no shams and depreciable assets exist, some person or entity is entitled to the intended tax advantages.[17] See *Estate of Thomas v. Commissioner*, 84 T.C. 412, 433-440 (1985). Petitioner, on the other hand, has overreached in arguing that he is entitled to depreciation and investment tax credit based upon the premise that Lorelei owned 100 percent of the photoplay.

The depreciation available to Lorelei and Factor, as joint owners, is dependent upon the basis in the asset. Sec. 167(g). Sections 1011 and 1012, read in conjunction with section 167(g), provide that depreciable basis shall be the properties' cost.[18] Because we have found that Lorelei and Factor have become joint venturers in the production and exploitation of the movie "Overboard," they are limited to the production costs of $1,487,445 as their basis for purposes of depreciation. The $2,390,000 stated sales price was merely established to cause the annual depreciation to "neutralize" the revenues anticipated from the NBC and Time-Life contracts. Accordingly, the parties will be required to recompute depreciation which will increase the amount of net income realized from the license revenues. Respondent disallowed all depreciations claimed by petitioners through their interest in Lorelei. Petitioners bear the burden of proving their depreciable basis and their entitlement to deductions, including depreciations. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142. The record in this case, considering that we are unable to agree with petitioners that they purchased an exclusive interest in the movie,

---

[17] The tax advantages may, of course, be limited or unallowable because of statutory provisions. See, for example, sec. 183.

[18] Respondent has not questioned the fair market value of the photoplay but has placed his reliance upon lack of an ownership interest.

does not support a basis for depreciation in excess of the production costs of $1,487,445.[19]

The investment credit available with respect to a motion picture film is set forth in section 48(k)(1)(A) and is based upon a taxpayer's "ownership interest." Section 48(k)(1)(C) equates "ownership interest" with the taxpayer's "proportionate share of any loss which may be incurred with respect to the production costs ." If one has an "ownership interest", i.e., a "depreciable interest", in at least a part of a qualified film, part or all of the investment tax credit may be claimed. Sec. 1.48-8(a)(4)(i), Income Tax Regs. Only $1,393,239 was claimed as basis for qualified property subject to the investment tax credit in Lorelei partnership returns for the 1978 and 1979 taxable years.[20] We find that Lorelei and its limited partners became a joint venturer with Factor at a time when the production of the movie was ongoing. Further, the $150,000 paid to Factor by Lorelei is to be considered as payment for a 25-percent interest in profits and losses in the joint venture. In view of the foregoing, Factor and Lorelei are found to be "owners" in their respective percentage loss ratio of the movie "Overboard" within the meaning of section 1.48-8(a)(4)(i) of the regulations.

We accordingly find that Lorelei owned a 25-percent interest in the movie and that petitioner is entitled to claim, through Lorelei, depreciation and investment tax credits in accord with his percentage interest in Lorelei. Due to our holding, the receipts, deductions, and credits attributable to the movie have, to some extent, been overstated by Lorelei and petitioner and must be adjusted accordingly. The amount of depreciation must be reduced to reflect the joint venture's basis, which is cost, and not the proposed purchase price.

Petitioners bear the burden of proof with respect to the delinquency addition to tax under section 6651(a) for the taxable year 1980. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142. Petitioners' appear to have abandoned this issue

---

[19] Neither party has cited sec. 280, which requires individuals to capitalize the production costs of motion pictures, among other assets, and to amortize such costs under an income forecast method, and, accordingly, we make no comment thereon.

[20] For 1978, $1,348,844 was shown as qualified property for computation of the credit, and $44,395 was shown for that purpose for 1979.

as it is not mentioned in their briefs and no evidence was offered on their behalf. We therefore sustain respondent's determination concerning an addition to tax for 1980 pursuant to section 6651(a).

To reflect the foregoing and concessions of the parties,

*Decisions will be entered under Rule 155.*