T.C. Memo. 1996-53


UNITED STATES TAX COURT


MAURICE E. HODGKINS AND BARBARA J. HODGKINS, Petitioners
v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20551-93.              Filed February 14, 1996.


    Held:  petitioners' rental losses redetermined; held,
further, gain from sale of real property redetermined; held,
further, petitioners are liable for additions to tax under
sec. 6653(a), I.R.C., for 1988, under sec. 6661, I.R.C., for
1988, and for an accuracy-related penalty under sec.
6662(a), I.R.C., for 1989.


Maurice E. Hodgkins and Barbara J. Hodgkins, pro se.

Daniel J. Parent, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, _Judge_:  Respondent determined the following deficiencies, additions to tax, and penalty in respect of petitioners' Federal income taxes:

| Taxable Year | Deficiency | Additions to Tax Sec. 6653(a) | Additions to Tax Sec. 6661 | Penalty Sec. 6662(a) |
|---|---|---|---|---|
| 1988 | $17,219.00 | $860.95 | $4,304.75 | -- |
| 1989 | 2,152.00 | -- | -- | $430.00 |

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years at issue, and all Rule references are to Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are:

(1)  How much are petitioners entitled to deduct as Schedule E expenses for real property located at 7786 Chancery Court, Citrus Heights, California, in 1988?

(2)  How much are petitioners entitled to deduct as Schedule E expenses for real property located at 7933 Sawgrass Circle, Citrus Heights, California, for 1988, and how much gain did petitioners realize from its sale?

(3)  Must petitioners increase their gain from the sale of real property located at 9266 Madison Avenue, Orangevale, California, by depreciation in the amount of $819 allowable in an earlier year, but not taken in that year?

(4) How much gain did petitioners realize from the sale of real property located at 400 Crow Canyon Drive, Folsom, California?

(5) Are petitioners liable for the addition to tax for negligence under Section 6653(a)(1) for 1988?

(6) Are petitioners liable for the addition to tax for substantial understatement of tax liability under section 6661 for 1988?

(7) Are petitioners liable for the accuracy-related penalty under section 6662(a) because of negligence or substantial understatement of income tax for 1989?

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, Maurice E. Hodgkins and Barbara J. Hodgkins, resided in Sacramento, California, at the time they filed their petition. For convenience we have divided this case by issues.

1. Chancery Court

FINDINGS OF FACT

While petitioners' names are on the marquee, the leading role in this case was played by petitioner husband's brother, John Hodgkins (John). They trusted John, and he directed them in their financial affairs, told them which documents to sign, kept their books, and supplied the figures for their tax returns. And

when they were audited, John dealt with their examination. He told them when to buy, sell, borrow against, and repair property. At John's direction, money went from petitioners to him and back again from him to them. But petitioners understood none of this.

From May 1986 until February 1988, when John was convicted for falsifying documents, he was licensed by California to sell realty. He involved petitioners in his real estate deals. At John's instigation, they purchased a house located at 7786 Chancery Court, Citrus Heights, California (Chancery Court) from William Paxton on December 23, 1986. They paid $67,000 for the house, and Mr. Paxton financed $17,000 of the cost. The record does not disclose how petitioners financed or otherwise obtained the remaining $50,000.

On February 19, 1987, petitioners borrowed $50,000 from the Jack Rice Revocable Trust (Jack Rice), using a mortgage on Chancery Court as security, which Jack Rice subsequently recorded. The note secured by the mortgage contained an acceleration clause under which, if petitioners were to sell, convey, or otherwise alienate Chancery Court, the loan would become immediately due and payable at the option of the holder. Despite this acceleration clause, John secured another loan using Chancery Court as security, as described below.

In August of 1987, John decided to combine two parcels of property and develop them as a 32-lot subdivision called "Westlake". John had already acquired an option to buy one of the parcels, but he needed capital to option the remaining parcel and develop Westlake. He took Larry Hashigami (Larry), an alleged drug king, as his first partner.

Larry agreed to fund 50 percent of Westlake. But, since John's three previous deals had failed, and since John intended to option both parcels in his own name, Larry demanded and got Chancery Court as security.

Pledging the house to Larry would have triggered the acceleration clause in Jack Rice's mortgage. So John orchestrated an hypothecation to keep Jack Rice unaware of John's machinations. John bought the house from petitioners, got them to execute a grant deed, and swore every one involved to silence. He gave the grant deed to Larry, but he made him promise not to record it. The deed purportedly granted title to William S. Hashigami, Larry's brother Sid, rather than to Larry himself.

John "purchased" Chancery Court from petitioners on August 25, 1987. The purchase was evidenced by a document entitled "Exchange Agreement", which provided that "This agreement shall be a complete and full satisfaction by virtue of the debt satisfied for the equity and ownership of the property Chancery Court." Petitioners agreed to deed Chancery Court to whomever

John requested, whenever he requested it.  In exchange, John agreed to pay Jack Rice's mortgage and the past due property taxes.  He also forgave a $9,340 debt of petitioners.  An addendum to the Exchange Agreement, which is inconsistent with the Exchange Agreement itself, provided that petitioners were to continue indefinitely to be the vested owners, to collect the rent, and to take the tax benefits of Chancery Court.

Although the addendum gave the rents to petitioners, John had already promised the rents to Larry in the Westlake Agreement.  The agreement gave Larry possession of Chancery Court as of September 1, 1987.  As part of his duties, he was to collect the rents and from them recoup his investment in Westlake.  Notwithstanding the addendum, which was fabricated by John, petitioners had no interest in the rents after August 25, 1987.  Petitioners reported no rent from Chancery Court on their 1988 income tax return.

Not only was the "Exchange Agreement" a sale of Chancery Court to John, but he also subsequently treated it as his own, arranging for its title to be recorded under another's name as collateral, and afterward, having that title holder deed it directly back to him rather than to petitioners.  This deeding and redeeding took place as the Westlake deal evolved.

After John arranged for Larry's security and successfully evaded Jack Rice's acceleration clause, he took other partners

into the deal.  One of the new partners, John S. Foggy, deceived John by purchasing the remaining unoptioned property.  To fight this deception, on December 15, 1988, John bought out Larry.  Larry agreed to give up his interest in Westlake, and as consideration John guaranteed Larry the return of his capital and a $50,000 profit, a total of $61,000.  John secured his guarantee by deeding Chancery Court to Sid, Larry's brother.  This time the agreement did not prevent the recording of the deed, and Larry recorded it on December 22, 1988.  Larry promised to have Sid redeed the property to John as soon as Larry received his money.

The Westlake Agreement explains that Sid's name was used on the Chancery Court deed because Larry was experiencing palimony problems.  But another possible reason for this action appeared on January 31, 1991, when the State of California brought a complaint for forfeiture in rem against Chancery Court.  California alleged that Larry was a drug king and that Larry's agents sold drugs at Chancery Court.  The State further alleged that Larry owned Chancery Court, as well as other property, and that the owners of record were mere straw men.

The titles to two properties, including Chancery Court, that Larry allegedly owned listed Sid as the owner.  Sid, however, did not know why his name appeared on either one of the deeds, and he officially disclaimed any right to Chancery Court on February 4,

1991.  John, meanwhile, asserted ownership.  He asked Sid to return the property to him.

At first Sid refused to deed the property back to John. Larry had not explained to Sid either the Westlake Agreement or the buy-out arrangement, and furthermore Sid's attorney advised him against deeding the property to John since both the I.R.S. and the Sacramento Sheriff's Office were making inquiries.  But then John wrote Sid a letter on September 27, 1991, the pertinent part of which provides:

> Your Brother and I were involved in a 32 lot
> subdivision.  He was asked to sign a Recession Contract
> eliminating him from the limited partnership.  He
> wanted some temporary collat[e]ral to guarantee his
> purported, Westlake Venture capital and profit.  He
> agreed upon 7786 Chancery Court.  However, because of
> his "[e]stranged situation", with Patty Buchannon and
> possible "palimony" problem, I refused to deed it to
> him, so we agreed to deed it to you Sid.  Sid, it's
> time to deed it back."  * * *

The letter further explains that John had made the mortgage payments for 5 years.  Shortly thereafter, on October 17, 1991, Sid deeded the property to John.  John's efforts, however, proved futile.  Jack Rice foreclosed on Chancery Court and sold it for $78,000 on November 21, 1991.

John's desire to avoid the acceleration clause in the Jack Rice mortgage produced evidence that petitioners continued to be owners of Chancery Court after they executed the Exchange Agreement.  Jack Rice issued a Form 1098 listing petitioner

husband as the payor of mortgage interest. Petitioners correspondingly deducted this interest on their tax return. The fire insurance policy for Chancery Court lists petitioners, along with Jack Rice, as the insureds. Under petitioners' names a further $5,000 was borrowed from Jack Rice against the property before the deed listing Sid as the owner was recorded.

On the other hand, when Jack Rice was not involved, petitioners failed to treat themselves as the owners of Chancery Court. For example, petitioners filed for bankruptcy, the timing of which coincided with the recording of the deed naming Sid as the nominal owner of Chancery Court. Petitioners failed to list Chancery Court or the encumbering mortgage on their bankruptcy petition. They also failed to list Chancery Court under property transferred within the past year.

                              OPINION

Respondent determined that petitioners did not own Chancery Court during 1988, that they did not use it for the production of income in that year, and that they did not pay any related expenses. Respondent therefore disallowed petitioners' claimed $14,904 loss from Chancery Court in 1988. This disallowance consisted of $11,369 in mortgage interest and $3,535 in depreciation.

We do not believe petitioners paid the mortgage. There is no reliable evidence that petitioners paid it, and most of the

evidence indicates that John paid it.  He was contractually obligated to do so and, furthermore, he states that he paid the mortgage interest in his letter to Sid asking for the return of the property.  Consequently, petitioners are not entitled to deduct $11,369 of mortgage interest on their 1988 return.

A taxpayer with bare legal title to property, but no capital investment or economic interest in it, cannot claim depreciation. Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976) affg. 64 T.C. 752 (1975); Helvering v. F&R Lazarus & Co., 308 U.S. 252 (1939).  The taxpayer entitled to the depreciation deduction is the one who suffers the economic loss of his investment by virtue of the wear and tear or exhaustion of the property--the one who has the economic benefits and burdens of ownership.  Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Leahy v. Commissioner, 87 T.C. 56 (1986).

The Exchange Agreement between petitioners and John transferred the benefits and burdens of ownership to John. Petitioners received the full fair market value for the property from John.  He agreed to pay back taxes, forgave a $9,340 debt that petitioners owed him, and assumed the mortgage.  True, petitioners remained liable on the Jack Rice mortgage, but John promised them that he would repay it.  Only if John failed would petitioners be forced to pay.  Hence, petitioners' position became tantamount to that of a guarantor rather than primary

obligor.  The risk of a decline in value rested on John, not petitioners.

The rewards of ownership were also transferred to John by the Exchange Agreement.  Any increase in value thereafter was his.  Even though petitioners did not transfer legal title to John when they signed the Exchange Agreement, they agreed to transfer title at John's request.

The parties also behaved as if John owned the property after the Exchange Agreement.  John used the property as collateral on one of his personal obligations and assigned the rents to guarantee repayment of this loan.  Moreover, when ownership of the property became confused, he fought for and got title transferred back into his name rather than into petitioners'.

We agree with respondent that petitioners are not entitled to deduct depreciation from Chancery Court for 1988.  All the credible evidence indicates that petitioners transferred the benefits and burdens of ownership to John on August 25, 1987, when they signed the Exchange Agreement.

2.  Sawgrass

John also involved petitioners in the purchase and resale of 7933 Sawgrass Circle, Citrus Heights, California (Sawgrass). Petitioners purchased the house from Sharon Benvenuti, obtaining a grant deed from her on March 28, 1988, but not recording it until August 16, 1988.  The house stood empty during petitioners'

ownership.  On September 2, 1988, a few weeks after petitioners recorded their deed, they sold the house to Inderjit and Bharati Dutt.

The gain that petitioners showed on their return and the gain that respondent determined are as follows:

|  | Per Return | Per Exam | Adjustment |
|---|---|---|---|
| Sales price | $127,500 | $127,500 | $-0- |
| Purchase price, improvements, and expenses of resale | (119,560) | (114,905) | 4,655 |
| Gain | 7,940 | 12,595 | 4,655 |

The parties' post-determination maneuvering adds complexity to their disagreement.  They stipulate or claim that some of what was capitalized should now be deducted and some of what was deducted should now be capitalized.  First, the parties stipulated that $1,837 previously capitalized should be deducted as an investment interest expense.  Second, petitioners assert that $9,851 previously deducted as a rental loss should now be capitalized.  In 1988 petitioners deducted a $9,851 rental loss, which respondent disallowed on the grounds that the property was unproductive, and for lack of substantiation.  Petitioners now concede that they did not use the property to produce income and that therefore they should not have taken the rental loss in 1988.  They now insist, however, that the expenditures entitle them to adjust their basis upwards.

Petitioners have failed to prove that their gain on Sawgrass was less than respondent determined. They offered as evidence a document entitled "Sellers Instructions", marked "Estimated". They also submitted a handwritten itemized summary of their calculation of gain, but did not substantiate most of the items listed. The items that they did substantiate--a $6,663 payment to make the mortgage current, $93,948 to repay the mortgage, and $7,957 to pay the cost of selling--do not exceed respondent's calculation. As for the expenses previously deducted as a rental loss, nothing in evidence substantiates them. Petitioners have the burden of proof, Rule 142(a), and they have failed to carry it.

### 3. Madison Avenue

#### FINDINGS OF FACT

In 1987 petitioners purchased property located at 9266 Madison Avenue, Orangevale, California (Madison Avenue). John maintained an office there. During 1988, petitioners incurred a rental loss on the property and sold it in June of that year. Respondent's Notice of Deficiency disagreed with both the claimed rental loss and the amount of gain shown on petitioners' return. After concessions, the only disputed issue is a $819 depreciation deduction.

Madison Avenue generated the deduction in 1987 and petitioners could have taken it then.  But, according to petitioners, they "goof[ed] up" and failed to deduct it. Respondent reduced the basis of Madison Avenue by $819, thereby increasing petitioners' gain.

OPINION

Section 1016(a)(2) provides that an adjustment to basis shall in all cases be made for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent of the amount allowed, but not less than the amount allowable. Petitioners cannot defer the deduction putatively allowable in 1987 to the current year.  Virginian Hotel Corp. v. Helvering, 319 U.S. 523 (1943).  And they cannot include the previously allowable depreciation deduction in their basis because they failed to take the deduction in a prior year.  United States v. Ludey, 274 U.S. 295 (1927); Collins v. Commissioner, 18 T.C. 99 (1952), affd. 203 F.2d 565 (6th Cir. 1953);  sec. 1.1016-3(a)(1)(ii), Income Tax Regs.  Therefore, petitioners' basis is reduced by the $819 depreciation deduction that they could have taken in 1987.

4.  Crow Canyon

Petitioners took out a $155,000 mortgage to purchase 400 Crow Canyon Drive, Folsom, California, (Crow Canyon) from Fireman's Fund Insurance Company (Fireman's Fund) on December 18, 1986.  Petitioners also made a $5,000 cash deposit in escrow.  Of the total $160,000 available by reason of the purchase money mortgage and the cash in escrow, $139,000 was applied to the purchase price of the property, and the balance to closing costs.  On January 6, 1988, the mortgagee foreclosed.  On disposition of Crow Canyon, petitioners received forgiveness of their $155,000 mortgage indebtedness.

Petitioners reported a net loss of $23,000 on the disposition of Crow Canyon.  Respondent, however, determined an $18,826 gain.  Respondent disallowed the following amounts, which petitioners claim as part of their basis:

| Item | Amount |
|---|---|
| 1986-1987 property taxes | $964 |
| Commission | 23,000 |
| Lost escrow deposit | 5,000 |
| Improvements | 9,191 |
| Interest paid in escrow | 3,670 |
| Total adjustment | 41,825 |

a.  <u>1986-1987 Property Taxes</u>

The parties now concur that petitioners' basis in Crow Canyon includes the property taxes that accrued prior to their ownership.

b.  <u>Commission</u>

Petitioners claim that they paid a $23,000 commission to John when they bought Crow Canyon.  This commission was not substantiated.

The purchase agreement provided:

Buyer and Seller acknowledge, understand and agree that neither Buyer nor Seller are obligated for any commission whatsoever in connection with the sale of the Property, including Joe Mefford Realty.

The so-called commission of $23,000 is 16.55 percent of the $139,000 purchase price.  Furthermore, this commission was payable, if at all, to John.  While an unusually large commission paid to a relative might, in some situations, be justifiable, the facts in this case do not support such a conclusion.

Petitioners offer as proof only self-serving documents prepared by John.  There is no reliable evidence that petitioners actually incurred the cost of the commission.  They claim that

they forgave a $23,000 debt, which John owed them, but presented no trustworthy evidence of this indebtedness.  We do not believe that petitioners paid the commission, and we therefore disallow the inclusion of this amount in petitioners' Crow Canyon basis.

c.  <u>Lost Escrow Deposit</u>

While respondent included in the basis of Crow Canyon $5,000 of earnest money, which was deposited in escrow and then used to purchase the property on December 18, 1986, petitioners assert that they are entitled to an additional $5,000.  Petitioners contend that they fumbled an earlier attempt to purchase Crow Canyon and, consequently, on that deal they lost their $5,000 of earnest money, also held in escrow.  They now seek to add this allegedly lost escrow deposit to their basis in Crow Canyon.

While we believe that petitioners previously deposited $5,000 into escrow and that this deposit was earnest money for an earlier agreement, we are unpersuaded that petitioners lost the money.  There is no document in evidence that describes the final disposition of the escrow account.  The documents submitted merely evidence an ongoing negotiation--signed by one party or

the other, but never by both. Petitioners failed to prove that they lost their deposit.

d.  Improvements

Respondent disallowed $9,191 of improvements that petitioners had included in basis. Respondent determined that the improvements were either unsubstantiated or previously deducted as repairs. Crow Canyon needed work when petitioners purchased it. They deducted $2,739 for repairs in 1986 and $5,500 in 1987. Petitioners also included in basis an additional $9,191 as improvements. Petitioners' sole substantiation for these repairs and improvements was a few receipts from 1986 totaling $1,763.31. Petitioners failed to distinguish these items from those amounts already deducted as repairs. We therefore deny petitioners' increase in basis for improvements.

e.  Interest Paid in Escrow

Respondent also determined that the first mortgage interest payment of $3,670 did not belong in the basis of Crow Canyon. Petitioners concede that they deducted $612 of the interest payment in 1986 and are therefore not entitled to include that amount in basis. The lender also charged petitioners a $50 fee

for obtaining a credit report.  Petitioners failed to argue their entitlement to this amount.  We therefore deem it conceded; $3,008 remains in dispute.

According to the Firemen's Fund Mortgage note, the first mortgage payment was for interest only and was payable in advance.  It was withheld from the loan proceeds at the close of escrow.  The payment covered the period from December 3, 1986, to February 1, 1987.  This period began 15 days before petitioners purchased Crow Canyon.  They claim that this prior-to-ownership interest was a loan fee, part of the lender's consideration, and that they therefore are entitled to include it in basis.

Interest is any amount paid for the use, forbearance, or detention of money.  Old Colony R. Co. v. Commissioner, 284 U.S. 552 (1932).  Interest, subject to numerous rules, is usually deductible rather than capitalized.  Petitioners have cited no section of the Code that would entitle them to capitalize this preownership interest, and we know of none.

As for the part of the first mortgage payment relating to the postacquisition period, petitioners claim that the property was under repair and unproductive.  They therefore also

capitalized this part of the interest payment.  Because petitioners acquired Crow Canyon on December 18, 1986, and the first payment covered the period ending on February 1, 1987, the interest capitalization rules for both 1986 and 1987 apply.

Under section 266, section 263A(f), and section 189 (repealed for years after December 31, 1986), mortgage interest on improved real property is only capitalized during a period of construction or further improvement.  Sec. 189(e)(2)(A) (repealed for years after December 31, 1986); sec. 1.266-1(b)(ii), Income Tax Regs.; sec. 1.263A-8(d)(3), Income Tax Regs.  Petitioners failed to prove that Crow Canyon underwent a period of improvement.  As already explained, petitioners substantiated only $1,763.31 of repairs on Crow Canyon.  Because we do not believe there was a period of improvement petitioners are not entitled to increase their basis by the amount of interest paid.

5.  Additions to Tax and Penalties

Respondent determined additions to tax for negligence under section 6653(a)(1) for 1988 and an accuracy-related penalty under section 6662 for 1989.  Section 6662(a) imposes a 20-percent accuracy-related penalty to any portion of an underpayment of tax

required to be shown on a return if, as provided in section 6662(b), the underpayment is attributable, among other things, to negligence or disregard of rules or regulations, or any substantial understatement of income tax.  Section 6662(c) includes in the definition of "negligence" any failure to make a reasonable attempt to comply with the Internal Revenue title, and defines "disregard" as including "careless, reckless, or intentional disregard".  We need not extend this opinion by rehashing the many instances in each of the years in issue in which petitioner carelessly, recklessly, or intentionally claimed erroneous deductions or additions to basis.  They either knew or should have known of these errors.  We therefore sustain respondent's determination.

Respondent also determined an addition to tax for substantial understatement of tax liability under section 6661 for 1988.  Petitioners have not shown that any of the exceptions contained in section 6661(b) apply.  The amount of any addition to tax pursuant to section 6661 will be computed under Rule 155.

Petitioners have the burden of proof on the additions to tax and penalty issues, which they have failed to carry.  Bixby v. Commissioner, 58 T.C. 757 (1972); see Grzegorzewski v. Commissioner, T.C. Memo. 1995-49.  Respondent's determinations of the additions to tax and penalty issues are therefore sustained.

To reflect the above,

Decision will be entered

under Rule 155.