RCA CORPORATION and National
Broadcasting Company, Inc.,
Plaintiffs,

v.

The UNITED STATES of
America, Defendant,

and

MCA, Inc., et al., Third-party
Defendants.

AMERICAN BROADCASTING
COMPANIES, INC., Plaintiff,

v.

The UNITED STATES of
America, Defendant,

and

MCA, Inc., et al., Third-Party
Defendants.

AMERICAN BROADCASTING COMPA-
NIES, INC., and Capital Cities/ABC,
Inc., Plaintiffs,

v.

The UNITED STATES of
America, Defendant.

Nos. 675–71, 676–71, 142–73, 24–78,
283–84T, 189–82T, 235–83T,
204–85T and 692–86T.

United States Claims Court.

June 30, 1987.

Martin D. Ginsburg, Washington, D.C., for plaintiffs American Broadcasting Companies, Inc., and Capital Cities/ABC, Inc. John T. Boese, Alan S. Kaden, Elliot E. Polebaum, John F. Coverdale and Brenda A. Stanulevich, of counsel.

Gilbert W. Rubloff, Mildred L. Seidman and Mary B. Seyferth, Washington, D.C., for defendant.

Stuart Robinowitz, New York City, for third-party defendants MCA Inc., Universal City Studios, Inc., MGM/US Entertainment Co., TCF Holdings, Inc. and Twentieth Century-Fox Film Corp. Boris I. Bittker, John C. Baity, Lewis R. Clayton, Helmut F. Furth and L. Anthony Joseph, Jr., of counsel.

Alfred D. Youngwood, New York City, for third-party defendant Warner Communications Inc. Eileen S. Silvers, of counsel.

William P. McClure, Washington, D.C., for third-party defendants Coca-Cola Co., Columbia Pictures Industries, Inc. and Gulf & Western Industries, Inc. Geoffrey B. Lanning and George L. Squires, of counsel.

## OPINION

MARGOLIS, Judge.

This litigation raises the issues of entitlement to investment tax credits (ITC) for television programs, the interpretation of 26 U.S.C. § 48(k), and the validity of Treasury Regulation § 1.48–8. Plaintiff American Broadcasting Companies, Inc. claims entitlement to the ITC for two groups of films; those it produced "in-house" and those produced by outside producers, some of which are the third-party defendants here. This opinion covers only the films produced by the third-party defendants. Third party defendants MCA, Inc., et al. (studios) moved for summary judgment in Nos. 189–82T, 235–83T, 204–85T, and 692–86T dismissing the claims of plaintiff covering the films produced by the studios, because the studios properly were allowed the ITC's in question. Plaintiff American Broadcasting Companies, Inc. (network) * moved for summary judgment on the preliminary issues that: 1) where investment is made in a qualified film, *someone* is entitled to the ITC under 26 U.S.C. § 48(k), and 2) the determination of "risk of loss" under 26 U.S.C. § 48(k)(1)(C) is a question of fact. The network also opposed the studios' summary judgment motion because it claims that entitlement to the ITC belongs to the party whose funds are at risk and that there is a question of fact here as to who bore the risk of loss. Defendant United States filed briefs supporting the studios' position. Plaintiff network's motion for summary judgment is denied because the bare issue of *someone's* qualification for the ITC is not ripe for decision, and regardless of the issue of risk of loss being a question of fact, that issue is not material to this litigation. Because the court finds that the legislative history, the statutory language, and the Treasury regulations combine to form a cohesive scheme, the studios' motion for summary judgment is granted.

## FACTS

The suits by the network are to recover income taxes paid in the amount of over $127 million for the years 1962 through 1979. The network claims the ITC for television films; the ITC was generally granted to the film producers with whom the network dealt. The films fall into two general categories. The first group is com-

---

* In No. 692–86T, Capital Cities/ABC, Inc. is also a plaintiff. Although summary judgment motions were not formally filed in this case, at oral argument, the parties stipulated that the result in the other three cases would control in this case as well.

prised of films produced and distributed subject to the "financial interest" rules promulgated by the Federal Communications Commission (FCC). These rules permit television networks (after August 1, 1972) to license outside producers' films for network telecast, but strictly prohibit their acquisition of any interest in off-network (syndication) rights. The second group consists of older films that were made before the effective date of the FCC rules and in which the network secured both network broadcasting rights and a profit-participation interest in syndication. The Internal Revenue Service (IRS) denied the network's claims with respect to the first group of films because the applicable regulations condition ITC eligibility upon ownership of at least a "part" of a film (*i.e.,* an interest in network *and* syndication exhibition); the IRS allowed the ITC for the second group of films to the extent that the network had acquired a "part" of the films and denied it where less than a "part" had been acquired. For both groups of films the network seeks the ITC for the full amount of the production costs for which it claims it bore the economic risk. The studios filed a summary judgment motion seeking dismissal of the network's entire claim insofar as it relates to the studios' films; the network has opposed this motion.

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). In evaluating a motion for summary judgment, the court must resolve any doubt as to whether there is a genuine issue of material fact in favor of the party opposing summary judgment. *Housing Corporation of America v. United States,* 199 Ct.Cl. 705, 710, 468 F.2d 922, 924 (1972); *Campbell v. United States,* 2 Cl.Ct. 247, 249 (1983). In addition, the inferences drawn from the facts must be viewed in the light most favorable to the party opposing summary judgment. *Adickes v. Kress & Company,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Ball v. United States,* 1 Cl.Ct. 180, 183 (1982). The studios and the government, although believing that some factual contentions of the network are self-serving, agree to have the studios' motion for summary judgment evaluated on the network's version of the facts.

The network characterizes its relationship with the studios as a comprehensive economic partnership; that is, one in which the network, from inception and throughout the development and production process, bears the economic risks with respect to film production costs. The network actively participates in each phase of the creative process, decides which film projects will go forward to production, and which film projects will be abandoned. Television films are developed at the request of a network, and network payments cover substantially all of the costs of development and production of pilot films and the resulting series. A studio will not produce a series unless virtually all the direct production costs will be covered by network financing. The network undertakes and discharges the burden of financing the development and production costs of the films, and agrees that in recouping its investment it will look exclusively to the film proceeds and will have no recourse against the studio. The relationship of the network with its advertisers in no way diminishes the financial risk of the network. The network claims that the nature of the network/studio relationship is too complex and dependent on oral understandings and industry customs to be resolved on the basis that "license agreements" may have been signed for some of the films in issue here. The network also claims that it has significant property rights in the films well beyond those enjoyed by a mere "licensee."

## DISCUSSION

### I. *FCC Regulations*

The background for consideration of the issues involved in this case is the FCC regulation, effective August 1, 1972, which states, in part, that no television network shall "acquire any financial or proprietary right or interest in the exhibition, distribution, or other commercial use of any television program produced wholly or in part

by a person other than such television network, except the license or other exclusive right to network exhibition within the United States." 47 C.F.R. § 73.658(j)(1)(ii) (1985). The networks are thus prohibited from acquiring syndication or other financial interests in programs produced by others. In addition, the Department of Justice has obtained consent decrees in settlement of antitrust actions which provide that the only rights the networks may obtain from outside producers are licenses for limited network exhibition. *See, e.g., United States v. American Broadcasting Companies, Inc.*, 1981–1 Trade Cas. (CCH) ¶ 64,150 at 76,895 (C.D.Cal.1980) (ABC is enjoined from acquiring any financial or proprietary right or interest in the exhibition, distribution, or other commercial use of any television program produced wholly or in part by an independent program supplier, other than the right to network exhibition of the program).

## II. *Internal Revenue Code and Regulations*

### A. *Standard of Review*

■ "Interpretive" Treasury regulations, *i.e.*, those issued under the authority of 26 U.S.C. § 7805, are entitled to deference if the regulation is not "unreasonable and plainly inconsistent with the revenue statutes." *Thomas International Limited v. United States*, 773 F.2d 300, 303 (Fed.Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 1261, 89 L.Ed.2d 571 (1986). Interpretive regulations are reasonable and valid if they harmonize with the statute's origin and purpose. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 26, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982). Where the statutory language is ambiguous the legislative history is relevant to determine if the regulation harmonizes with the statute's origin and purpose. *Id.* at 25–26, 102 S.Ct. at 827–28. Regulations issued under the authority of § 7805 are entitled to less deference, however, than those issued under a specific statutory grant of authority. *Id.* at 24, 102 S.Ct. at 827.

■ The regulations of concern here were issued in 1979 under the authority both of 26 U.S.C. § 7805 and of 26 U.S.C. § 38(b) (repealed by Pub.L. No. 98–369, 98 Stat. 833, § 474(m)(1) (1984)), which authorized the Secretary of the Treasury to "prescribe such regulations as may be necessary to carry out the purposes" of the ITC. 26 U.S.C. §§ 38(b), 7805 (1982); *see* 44 Fed. Reg. 20,416, 20,423 (Apr. 5, 1979). Such "legislative" regulations are entitled to considerable deference; they should be upheld unless they are so arbitrary and capricious as to be plainly inconsistent with the statute's language and purpose. *Fulman v. United States*, 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978); *Batterton v. Francis*, 432 U.S. 416, 425–26, 97 S.Ct. 2399, 2405–06, 53 L.Ed.2d 448 (1977). This standard requires only that the regulation have some reasonable basis in the law. *Fulman*, 434 U.S. at 536, 98 S.Ct. at 846.

Regardless of the limited standard of review to be accorded the regulations at issue here, it is useful to examine the legislative history to address fully the contentions of the network that the regulations do not comport with the statutory language or congressional intent.

### B. *Legislative History*

Prior to 1971 it was not clear whether, and if so under what conditions, the ITC was available for movie or television films. In *Walt Disney Productions v. United States*, 327 F.Supp. 189, 192 (C.D.Cal.1971), *aff'd as modified*, 480 F.2d 66 (9th Cir. 1973), *cert. denied*, 415 U.S. 934, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974), the court held that movie films were tangible personal property eligible for the ITC. Because the law contained uncertainties regarding the ITC for films, and Congress wanted to allow accurate investment planning in the movie industry, the proposed Tax Reform Act of 1974, § 243, contained specific rules for films. This section was also contained in the proposed Tax Reform Act of 1975, H.R. 10612. H.R. 10612 was enacted as the Tax Reform Act of 1976, Pub.L. 94–455, 90 Stat. 1520, § 804 (relevant ITC portion codified at 26 U.S.C. § 48(k) (1982 & Supp. II 1984)); § 804 is identical to § 243

in the proposed 1974 bill. The legislative history of both § 243 and § 804 is thus relevant in examining the statute's language and purpose.

Prior to the drafting of the law, the House Ways and Means Committee prepared a report to be used for drafting tax reform proposals. Regarding the ITC for movie films the report said that "[t]he committee also agreed that the investment credit should be available in the case of film to the persons who bear the risk of loss if the film is not a successful picture." Committee on Ways and Means, U.S. House of Representatives, 93d Cong., 2d Sess., Brief Description of Tentative Decisions made by the Committee on Ways and Means for Drafting Purposes on Tax Proposals, 16 (Comm. Print Aug. 22, 1974).

The legislative history of H.R. 10612 contains a wealth of information on its purpose as far as who is entitled to the credit. The House Ways and Means Committee said in part:

> a taxpayer is to be entitled to the investment credit for a movie film if, and to the extent, that he has an "ownership interest" in the film at the time it is placed in service. For purposes of these rules, a taxpayer will be treated as having an ownership interest to the extent that his capital is at risk....

> \*       \*       \*       \*       \*       \*

> Generally, where the distributor has borne the cost of producing a film, ... the distributor ... is entitled to the credit. In the case of a film or series which is made for television, the producer-distributor will also generally be entitled to the credit where the film is exhibited over the network pursuant to a licensing agreement. On the other hand, if the network purchased all rights to the film or series before it was placed in service, the network would be entitled to the credit.

> ... Generally, where more than one party bears the risk of loss with respect to a particular film, the Secretary of the Treasury or his delegate may establish procedures for determining who is entitled to the credit, or partial credit.

H.R.Rep. No. 658, 94th Cong., 1st Sess. 194, *reprinted in* 1976 U.S.Code Cong. & Admin.News 2897, 3088–89. The Senate Finance Committee Report is virtually identical to the House Report quoted above regarding who is entitled to the credit, except that after the discussion of multiple parties' risk of loss it adds the following:

> Of course, where there are several parties to a transaction involving a movie film, and one party is entitled to the investment credit with respect to that film under these [Treasury] rules, whereas the other party is not, the committee anticipates that the availability of the investment credit may often be taken into account by the parties in determining their contract arrangements.

S.Rep. No. 938, 94th Cong., 2d Sess. 192, *reprinted in* 1976 U.S.Code Cong. & Admin.News 3439, 3623.

Under 26 U.S.C. § 48(d) it is possible for a party who has leased property to be eligible for the ITC in certain circumstances. That Congress was aware of the FCC limitations on television network ownership of films is clear from the Senate Conference Report on H.R. 10612, which stated in part:

> the conferees wish to clarify that under certain circumstances, it may be possible for the rights to the film to be leased under section 48(d) before the film is placed in service. However, it is intended that this right is to be available only where the lessee acquires full rights to exploit the movie or film for its estimated useful life through a particular medium or in a particular geographic area; it is not to be available where the lessee is precluded (by law, regulation or governmental action) from acquiring all rights to commercially exploit the film or tape.

S.Rep. No. 1236, 94th Cong., 2d Sess. 447.

C. *Statutory Language*

26 U.S.C. § 48(k), the Internal Revenue Code section at issue here, states in part:

**(1) Entitlement to Credit.—**

    **(A) In general.—**A credit shall be allowable under section 38 to a taxpayer

with respect to any motion picture film or video tape—

(i) only if such film or tape is new section 38 property (determined without regard to useful life) which is a qualified film, and

(ii) only to the extent that the taxpayer has an ownership interest in such film or tape.

**(B) Qualified film defined.**—For purposes of this subsection, the term "qualified film" means any motion picture film or video tape created primarily for use as public entertainment or for educational purposes. Such term does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature.

**(C) Ownership interest.**—For purposes of this subsection, a person's "ownership interest" in a qualified film shall be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film.

26 U.S.C. § 48(k) (1982). It is useful to note that the heading of § 48(k)(1)(C) does not indicate that it *defines* "ownership interest," as does § 48(k)(1)(B) regarding "qualified film."

### D. *Treasury Regulations*

Treasury Regulation § 1.48–8 (26 C.F.R. § 1.48–8 (1986)) covers the ITC for motion picture and television films and tapes. Portions of the regulation pertinent to this litigation are quoted below.

(a) *Entitlement to investment credit*—(1) *In general....* For the taxpayer to be entitled to the investment credit, the film or tape placed in service must be "new section 38 property", ... must be a qualified film ..., and the taxpayer must have an ownership interest in at least a part of the film (within the meaning of paragraph (a)(4) of this section)....

(2) *Film may be divided into parts.* ... For purposes of this section, "a part" of a film means the exclusive right to display a qualified film in one or more mediums of exhibition in one or more geographical areas over the entire period of substantial exploitation of the film in

the medium(s) in the geographical area(s).... For purposes of this section the term "medium of exhibition" includes, for example, free television (network telecasts and television syndications) or movie theaters.... If the owner of a qualified film transfers to another person rights to display the film on a limited basis, which do not constitute a transfer of an ownership interest in a part of the film, the owner will still be treated as having "the exclusive right to display the film." For example, if the owner of a film transfers to a television network the right to display the film on network television (but does not transfer to the network syndication rights) the owner is considered to retain the "exclusive right to display the film." On the other hand, if the owner transfers to a television network all free television rights (network telecasts and television syndications) to the film before the film or any of its parts have been placed in service, the owner is considered to have sold a part of the film to the network and the network will be entitled to claim investment credit based on its qualified United States production costs....

\*    \*    \*    \*    \*    \*

(4) *Ownership interest*—(i) *In general.* To obtain the investment credit with respect to a qualified film, a taxpayer must have an ownership interest in at least a part of the film. That is, the taxpayer must have a depreciable interest in at least a part of the film. However, the amount of credit allowable to a taxpayer with respect to a qualified film is determined only on the basis of that taxpayer's proportionate share of any loss which may be incurred with respect to the production costs of the qualified film. The proportionate share of any loss which may be incurred with respect to production costs by a taxpayer is the amount that the taxpayer's capital is at risk. Advance rentals (i.e., payments for the transfer of less than a part) received or accrued by a taxpayer prior to the date on which a qualified film is placed in service, and which are includible as ordi-

nary income in the taxpayer's gross income will not reduce the amount that the taxpayer's capital is at risk. . . .

\*     \*     \*     \*     \*     \*

(iii) *Certain lenders and guarantors considered to have an ownership interest.* To qualify for the investment credit with respect to a qualified film, the taxpayer must have a depreciable interest in at least a part of the film. Solely for purposes of this paragraph, a taxpayer who, at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof, will be regarded as having a depreciable interest in at least a part of the film if he can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film. . . .

\*     \*     \*     \*     \*     \*

(g) . . . (4) *Credit unavailable to lessees.* The election under section 48(d) by which a lessor of property may elect to treat a lessee as having acquired the property is not available with respect to a qualified film. To obtain the credit with respect to a film a taxpayer must acquire full rights to exploit a qualified film for its estimated useful life through at least a particular medium in a particular geographical area. . . .

## III. *Plaintiff's Preliminary Claims*

Plaintiff network has moved for summary judgment on two preliminary issues: that where a qualified film is placed in service *someone* is entitled to the § 48(k) credit, and that the issue of risk of loss is determined as a question of fact.

### A. *Entitlement to the credit*

■ The regulations quoted above are structured to ensure that someone gets the credit when a qualified film is placed in service. For example, transfer of less than a part allows the owner to retain the "exclusive right to display the film," and therefore the right to the ITC. Treas.Reg. § 1.48–8(a)(2). Payment for transfer of less than a part will not reduce the amount

that the owner's capital is at risk where the payments are included in ordinary income. Treas.Reg. § 1.48–8(a)(4). Transfer of a part before a film is placed in service, however, results in transfer of the entitlement to the ITC to the extent that the transferee's capital is at risk for the proportionate share of the qualified production costs of the film. Treas.Reg. § 1.48–8(a)(2), (4).

■ No party here has claimed that there will be common situations where no one will be entitled to the ITC for qualified films. The government has specifically asserted that typically someone does own each "part" of each qualified film and will therefore be entitled to at least a share of the ITC. Absent facts showing that the regulations will deny the ITC for qualified films in these cases before this court, this issue is simply not ripe for decision and such a holding would constitute an impermissible advisory opinion. *See, e.g., Manufacturers Hanover Trust Co. v. United States,* 218 Ct.Cl. 563, 566, 590 F.2d 893, 894 (1978) (the court is not empowered to decide abstract propositions). Plaintiff's summary judgment motion on this subject is therefore denied.

### B. *Risk of loss as a question of fact*

The plaintiff seeks a holding that the issue of risk of loss is determined as a question of fact. To evaluate plaintiff's claim of entitlement to the ITC at issue here, the court must evaluate the regulations in light of the facts as proposed by the plaintiff. For this purpose the court is prepared to acknowledge that plaintiff is at economic risk and will lose money if any film it "licenses" from the studios or "finances" (whatever term one desires) is a failure. The court does not think it critical what use the studios make of the money paid by the network; the network admittedly will "lose money" if the film is not successful, while under the Treasury Regulation it is the studios' capital that remains "at risk" because less than a part is transferred for a payment made prior to placing the film in service.

■ If the plaintiff is seeking to establish a "one-prong" test of ITC entitlement through its motion for summary judgment on this issue, the court is simply unwilling to accommodate this request. Capital at risk is clearly important for determining entitlement and amount of the ITC, but it is not the sole consideration. Plaintiff's motion for summary judgment on this issue is denied.

### IV. *Validity of Treasury Regulation § 1.48–8*

The plaintiff network asserts that the sole and guiding criterion for entitlement to the ITC for films is the determination of the party bearing the risk of loss. Because it claims that it financed the production costs of the films at issue here, and therefore that it alone bore the risk of loss for substantially all of the production costs, it is entitled to the ITC for those production costs it bore. Plaintiff claims that Treas. Reg. § 1.48–8, with its "two-prong" test of entitlement to the credit (ownership of at least a part plus capital at risk), is inconsistent with the statutory language and the legislative history, and therefore must either be struck down or plaintiff's situation be evaluated as an "unprovided-for case" under the regulations. Plaintiff asserts that because it is an economic partner with the studios in production of the films—an unprovided-for case—the credit should be shared in proportion to the money each will lose if a film is unsuccessful; plaintiff does not claim, however, that it is *actually* a partner of the studios as contemplated by the regulation. For a discussion of the production and marketing of television films, see *Cosby v. United States*, 8 Cl.Ct. 428, 432–34 (1985), *aff'd*, 795 F.2d 999 (Fed. Cir.1986).

The court does not believe that the language of § 48(k) clearly defines "owner" only as the party bearing the risk of loss; the statutory language is ambiguous. The legislative history of § 48(k) indicates that "risk of loss" was an important consideration in its passage. The legislative history also supports the ownership concept in the regulation, however, in that the pertinent congressional reports speak to the credit being given if and to the extent that a taxpayer has an "ownership interest" in a film, where "all rights" to a film were purchased, and where a lessee acquires "full rights" to exploit the film for its useful life. The "part" concept is necessary to the evaluation of ownership of a film because a film by its nature can be divided, while other more traditional types of tangible property cannot. *See, e.g., Tolwinsky v. Commissioner*, 86 T.C. 1009, 1041–43 (1986) (discussing the possible ways a motion picture may be divided), *appeal docketed*, No. 87–1014, 87–1015 (7th Cir. Jan. 5, 1987). The regulation reflects the attempt by the IRS to establish clear tests for entitlement within the framework of the statute and the legislative history which would allow "accurate investment planning for the movie industry." S.Rep. No. 938, *supra*, at 185, 1976 U.S.Code Cong. & Admin.News at 3617.

■ Congress clearly intended that where the Treasury regulation awarded the ITC to one party in a multiple-party transaction, such entitlement would be used in contract bargaining between the parties. *Id.* at 192, 1976 U.S.Code Cong. & Admin. News at 3623. It thus was *not* congressional intent that each entitlement to the ITC for movie and television films would involve an elaborate investigation into who would *really* lose money if a film was unsuccessful. Such an investigation could easily result, for example, in advertisers, cable television networks, or television stations claiming to be financially at risk with respect to films they sponsor or broadcast; the accounting and proof standards necessary to evaluate entitlement to the ITC in such cases would be beyond the resources of the IRS. This result would not aid financial planning in the movie industry. The court does not believe that addition of a requirement for "creative involvement" to this investigation, as the network appears to suggest, would simplify entitlement to the ITC. On the contrary, the simplest mechanism for evaluation of entitlement to the ITC appears to the court to be use of Treas.Reg. § 1.48–8.

The network has drawn the court's attention to several cases which it asserts demonstrate that "ownership" is *not* required for entitlement to the ITC.

In *Law v. Commissioner*, 86 T.C. 1065 (1986), *appeal docketed*, No. 87–7003 (9th Cir. Jan. 5, 1987), the taxpayer's limited partnership purportedly purchased an interest in a motion picture; at issue was the taxpayer's right to share in the losses of the partnership and to the ITC. The court found that the partnership did not purchase an ownership interest in the motion picture but rather the mere right to share in future profits, if any. The partnership could therefore not claim depreciation deductions for the value of the film, but only on its contractual right to participate in the film's profits. The taxpayer, thus, did not own a depreciable interest in the film; the court evaluated the right to the ITC with this finding as a backdrop. The court stated that "[a] taxpayer may have an 'ownership interest' in a motion picture for purposes of the investment credit even if the taxpayer has neither legal title to nor a depreciable interest in the motion picture." *Id.* at 1108. However, the court found that the taxpayer in this case was an "owner" because it met the regulation's definition of a "lender or guarantor" in § 1.48–8(a)(4)(iii) because the partnership could look for repayment "solely to the proceeds generated from the exhibition or disposition of at least a part of the film." *Id.* at 1110. Being a lender or guarantor thus gives a taxpayer an "ownership interest" for purposes of the regulation, although it remains necessary to "own" at least a "part." *Id.* at 1109–13. The partnership payment purportedly made for purchase (in reality a guarantee, according to the court) of an interest in the film was made to a party who owned *all* rights in the subject film; the partnership would thus look to at least a "part" of the film for repayment. *Id.* at 1109–10.

The recent case *Vandenhoff v. Commissioner*, T.C. Memo. 1987–116 (Feb. 26, 1987), reached the same result on very similar facts. There, also, a limited partnership purchased a contingent participation in the gross receipts of a motion picture, not an "ownership" interest. The court found, however, that the facts indicated that the limited partnership was a "lender or guarantor" of the production costs under § 1.48–8(a)(4)(iii). *Id.*, slip op. at 47–48. The partnership was a "lender" to the party who owned all rights to the film, *id.*, slip op. at 34–35, and the partnership could thus look for repayment of production costs solely from proceeds generated from the exhibition or disposition of a "part" of the film. The ITC was thus available to the taxpayer. *Id.*, slip op. at 48.

Even if the network here was a "lender or guarantor" of the funds used to produce the films within the contemplation of § 1.48–8(a)(4)(iii), it could not look for repayment to a "part" of the films; FCC regulations prohibit the network from acquiring a part (as defined in § 1.48–8(a)(2)) of the films, and it thus would not have an "ownership" interest.

In *Leahy v. Commissioner*, 87 T.C. 56 (1986), the Tax Court evaluated whether a limited partnership had acquired an ownership interest in a motion picture entitling it to depreciation deductions and the ITC. The court found that the partnership became a joint venturer with the owner of the photoplay and producer of the motion picture, thus making each party a joint "owner" for ITC purposes. *Id.* at 71–73. The producer and the partnership were to share profits and losses, and the partnership had the right to have the film's copyright transferred to it. *Id.* at 70–71. The joint venture was thus the "owner" of the motion picture subject only to licenses in favor of NBC and Time-Life (transfer of licenses do not constitute transfer of a "part" under § 1.48–8(a)(2) and do not reduce an owner's capital at risk if the payments are included in income under § 1.48–8(a)(4)(i)). *Id.* Eligibility for the ITC was thus dependent on whether the taxpayer had an ownership interest in the motion picture. *Id.* at 73. This case does not support the network's assertion that only "capital at risk," rather than "ownership" is the focus of § 48(k). *See also Tolwinsky*, 86 T.C. at 1065 ("Although [taxpayer] was at risk with respect

to the cash paid to [producer], it did not possess an ownership interest in any part of [the movie] for purposes of the investment credit.").

■ The cases cited by the network support, rather than negate, the studios' and government's insistence on the use of a two-part test for entitlement to the ITC, *i.e.*, ownership of a part plus capital at risk, as required by Treas.Reg. § 1.48–8. The regulation is supported as well by the legislative history, and is not seriously undermined by the language of § 48(k) itself. This regulation would pass muster even under the stricter judicial review for interpretive regulations; as a legislative regulation it is clearly consistent with the statutory language and purpose and thus will be upheld. *Cleveland Electric Illuminating Co. v. United States*, 6 Cl.Ct. 711, 713–14 (1984).

## V. *Unprovided-For Case*

■ Because it claims to be an economic partner with the studios, the network claims that its is an "unprovided-for case" under the regulation, as was the situation in *Leahy* where the tax court found a "joint venture" to exist and thus found the required "ownership." In *Leahy*, however, an agreement existed to share profits and losses; no allegation has been made here that the network and the studios will share profits and losses. Rather than constitute an unprovided-for case under the regulation, as claimed by the network, the circumstances of network payment to producers of television films fits squarely within the regulation and ensures that the credit will be available for qualified films. Because the network is prohibited by FCC regulation from owning the rights to free television (network broadcast plus syndication rights), it cannot be the "owner" of a "part" of the films under Treas.Reg. § 1.48–8(a)(1). The studios, by transferring the right to network broadcast, are considered to have transferred "less than a part" to the network and thus to have retained the "exclusive right to display the film," *i.e.*, to remain the "owner" for purposes of the ITC. Treas.Reg. § 1.48–8(a)(2). The funds advanced to the studios by the network, *i.e.*, the payments made by the network for the transfer of less than a part of the films, are considered not to reduce the amount that the studios' funds are at risk because they are made prior to the films being placed in service and are included in the ordinary income of the studios. Treas.Reg. § 1.48–8(a)(4)(i). Under the regulatory scheme, therefore, the studios retain *both* ownership and capital at risk, and qualify for the ITC.

Allowing the investment tax credit for movie and television films solely to the party who could "demonstrate" that it has the most to lose would wreak havoc on the administration of the ITC for movie and television films, and could involve the IRS and the courts in determinations of creative involvement and perceived financial investment dangers in the television industry— areas well out of their domain. On the contrary, Treas.Reg. § 1.48–8 establishes clear rules for eligibility for the ITC and allows the parties to take them into account in determining their contract arrangements, as anticipated by Congress. Because the ITC was given to the studios as intended by the regulation and the regulation is in harmony with the statutory language and purpose, the studios' motion for summary judgment as to the films produced by the studios in Nos. 189–82T, 235–83T, 204–85T, and 692–86T is granted.

## CONCLUSION

Because the court finds Treasury Regulation § 1.48–8 to be consistent with the language of 26 U.S.C. § 48(k) and its purpose as reflected in the legislative history, the regulation is upheld. The Internal Revenue Service's denial of the plaintiff's tax refund claims is upheld. Plaintiff's motion for summary judgment on the "preliminary issues" is denied. The third-party defendant studios' motion for summary judgment in Nos. 189–82T, 235–83T, 204–85T, and 692–86T is granted, and the plaintiff's claims in these cases for the ITC on films produced by the third-party defendants are denied.

The court believes that appellate review of this decision will facilitate resolution of the remaining claims in these cases and determines that there is no just reason to delay entry of judgment for the third-party defendants dismissing the plaintiff's claims as to the films produced by the third-party defendants. Pursuant to RUSCC 54(b), the Clerk will dismiss the complaints in Nos. 189–82T, 235–83T, 204–85T, and 692–86T as to the films produced by the third-party defendants. Each party is to bear its own costs.