T.C. Memo. 2017-196

UNITED STATES TAX COURT

BRENDA K. SMILING AND A. MARK SMILING, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18487-14.                    Filed October 3, 2017.

<u>Edith Faye Moates</u>, for petitioners.

<u>G. Chad Barton</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  With respect to petitioners' Federal income tax for 2009, the

Internal Revenue Service (IRS or respondent) determined a deficiency of $24,251

and an accuracy-related penalty under section 6662(a) of $4,850.20.[1]  After

_____

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect for the tax year at issue, and all Rule references are to the
(continued...)

[*2] concessions,[2] the issues remaining for decision are whether petitioners are:

(1) entitled to deduct settlement expenses of $331,455 reported on their Schedule

C, Profit or Loss from Business, or the additional settlement expenses of $168,900

asserted in their petition, (2) entitled to deduct legal and professional services

expenses in excess of the $49,549 respondent allowed, and (3) liable for the

accuracy-related penalty under section 6662(a). With one minor exception, the

Court resolves all issues in favor of respondent.

FINDINGS OF FACT

Some of the facts were stipulated and are so found. The first stipulation of

facts, the first supplemental stipulation of facts, and the respective accompanying

---

[1](...continued)
Tax Court Rules of Practice and Procedure.

[2]Petitioners conceded the Schedule C reconciliation adjustment of $853, the Schedule C wage adjustment of $30,007, the Schedule C taxes and license adjustment of $2,510, and the Schedule C gross receipts adjustment of $107,366. The parties agree that, for the purposes of computing self-employment tax, the self-employment income on page 15 of the notice of deficiency should be decreased by $154,988, as set forth in more detail in the stipulation of facts.

**[*3]** exhibits are incorporated by this reference.[3]  Petitioners resided in Oklahoma when they timely petitioned this Court.

A. Mark Smiling (petitioner) is an experienced attorney and litigator, having practiced law in Oklahoma for more than 30 years.  He operates his law practice as A. Mark Smiling, PLLC, offering representation in many areas of the law.  Neither petitioner nor any of the other attorneys in his law firm practice in the area of tax law.

Petitioners' Claimed Settlement Expense Deduction

The settlement expenses petitioners reported on their joint 2009 Form 1040, U.S. Individual Income Tax Return, relate to an assignment of claim granted in a divorce decree by the District Court of Tulsa County (divorce court) in 2009.  The underlying divorce proceedings, however, began as separation proceedings between Drs. Lewis and Moon[4] in 2005.[5]  It is helpful to begin with petitioner's

---

[3]Following the trial, the Court left the record open for petitioners to introduce evidence of checks not in the record that were returned to Dr. Moon. The parties filed a second supplemental stipulation of facts with attached exhibits. Respondent objected to the admission of the exhibits, and petitioners "have no problem with * * * [the exhibits'] not being admitted into evidence because they are not in support of petitioners' position on any issue before the Court." Accordingly, the Court sustains respondent's objections with respect to the second supplemental stipulation of facts.

[4]Although Dr. Moon has multiple aliases, for consistency and simplicity, the
(continued...)

[*4] involvement in Dr. Moon's conflict to understand why the divorce court awarded a claim of right against petitioner to Dr. Lewis (Dr. Moon's former spouse) and why petitioner's settlement of that claim was deducted as a Schedule C business expense.

In an effort to explain his financial relationship with Dr. Moon, petitioner offered his testimony and limited documentary evidence. His documentary evidence consisted of his IOLTA[6] account statements for January and February of 2006, canceled checks, promissory notes, and receipts for funds received. Other than petitioner's testimony and selected divorce court records, there is no evidence to support petitioner's recitation of the financial trail of fund transfers between Dr. Moon and petitioner.

Dr. Moon was an oncologist, licensed to practice medicine in the State of Tennessee. Petitioner thought he first met Dr. Moon in the fall of 2005 to discuss her potential investment in a business he owned. On December 12, 2005, Dr.

---

[4](...continued)
Court will refer to her only as Dr. Moon.

[5]The separation proceedings were converted into divorce proceedings on February 1, 2006. Because petitioner represented Dr. Moon through May 26, 2006--and for simplicity--the Court will refer to that case as the divorce proceedings.

[6]An IOLTA is a lawyer trust account for client funds held for short periods.

**[*5]** Moon was convicted of Federal crimes associated with her dilution of life-saving cancer drugs.[7] Her then husband, Dr. Lewis, filed for separation on December 16, 2005.

Sometime thereafter, Dr. Moon met with petitioner. During this meeting, Dr. Moon requested that petitioner represent her in the divorce proceedings and in proceedings before the Tennessee Board of Medical Examiners with respect to her medical license. Although petitioner is not licensed to practice law in the State of Tennessee, on December 22, 2005, he accepted a $200,000 retainer from Dr. Moon for the medical-license-related representation. Petitioner also agreed to represent Dr. Moon in the divorce proceedings. In addition petitioner accepted cashier's checks from Dr. Moon, the proceeds of which were to be used to invest in a medical business he owned, Advantage Diagnostic & MRI, LLC (Advantage Diagnostic), to purchase a PET scanner.[8]

---

[7]The Court takes judicial notice of the docket entries in United States v. Moon, No. 2:05-cr3 (M.D. Tenn. filed Mar. 2, 2005). See Fed. R. Evid. 201(a), (c); Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006) (stating that the court "may take judicial notice of court filings and other matters of public record"); United States v. Harris, 331 F.2d 600, 601 (6th Cir. 1964) (explaining that a court may take judicial notice sua sponte).

[8]Petitioner formed Advantage Diagnostic on March 21, 2005. During the year at issue, petitioner owned 80% of Advantage Diagnostic. A positron emission tomography or PET scanner is a nuclear medicine imaging device that

(continued...)

**[*6]**  The retainer and the investment came in the form of two checks and cash. The checks totaled $306,000 and were received on December 22, 2005:  one was written for $103,517.91, the other for $202,482.09.  Petitioner also received $164,000 in cash from Dr. Moon the following day.  Petitioner deposited the checks into his IOLTA, keeping $200,000 in that account as a retainer for his future representation of Dr. Moon in the Tennessee medical-license-related proceeding, and writing a $106,000 check to Advantage Diagnostic.[9]  The same day petitioner signed a receipt and a promissory note for $270,000--accounting for $106,000 from the checks received on December 22 and $164,000 in cash received on December 23--and promised to repay with interest this amount in monthly installment payments beginning in February 2006.[10]

---

[8](...continued)
produces three-dimensional images.

[9]Petitioner testified both that the $106,000 was invested in Advantage Diagnostic and that $2,482.09 of the $202,482.09 check was payment for his services in Dr. Moon's divorce proceedings.  There is no evidence of $2,482.09 being paid from petitioner's IOLTA to his firm's operating account.

[10]There is no record that petitioner or Advantage Diagnostic made any of these required installment payments.  Petitioner repaid the $200,000 retainer to the divorce court on June 30, 2006, and he--rather than Advantage Diagnostic--repaid $103,517.91 to the divorce court on March 13, 2007.

[*7]   On January 19, 2006, petitioner received a cash deposit of $60,000 from Dr. Moon.  This time he prepared a receipt acknowledging that he was holding the cash until she directed him where to put the funds.  There is no record of deposit, investment, or use of these funds.

On January 27, 2006, petitioner received a $300,000 cashier's check from Dr. Moon for investment in a carwash.  He deposited this check into his IOLTA and promptly wrote a new check to TWB, LLC, the entity created to own and operate the carwash.[11]

On February 27, 2006, petitioner received from Dr. Moon "$62,500 cash and $107,500 * * * for loan for imaging center".  On March 7, 2006, petitioner received $90,000 from Dr. Moon "to be invested or used as Mr. Smiling deems appropriate."  On March 12, 2006, petitioner received from Dr. Moon "$200,000 checks and $110,000 cash to be invested or used as Mark Smiling deems

---

[11]Petitioner owned 5% of TWB.  TWB repaid the $300,000 to the divorce court on August 28, 2007.

[*8] appropriate."[12] There is no record of deposit, investment, or use of any of these funds.

Collectively, between December 22, 2005, and March 12, 2006, petitioner received $1.4 million from Dr. Moon.[13] Soon after, on March 15, 2006, in his capacity as Dr. Moon's divorce attorney, petitioner defended Dr. Moon in a deposition where she was accused of hiding assets from Dr. Lewis.[14]

On April 11, 2006, petitioner completed and signed a life insurance change of beneficiary form he had requested from his insurance agent. The witnessed form listed petitioner's relationship with Dr. Moon as business partners and designated Dr. Moon as beneficiary of a life insurance policy on petitioner of $1.4

---

[12]Petitioner suggested that by this time Dr. Moon had decided not to pursue the proceeding related to her medical license. This might be true; Dr. Moon, represented by counsel other than petitioner, filed an agreed order with the Tennessee Board of Medical Examiners on March 15, 2006, agreeing to the revocation of her medical license. Petitioner also suggested that he returned the $200,000 retainer and that the "$200,000 checks" was that same amount. The Court finds that the record does not support his explanation as credible.

[13]Although the divorce court found that petitioner received "at a minimum" $1.4 million, the record in this case supports this Court's finding that he received exactly $1.4 million.

[14]The decree of dissolution of marriage set forth the divorce court's findings that Dr. Moon pursued a malicious, fraudulent, and deceitful scheme designed to deny Dr. Lewis his right to an equitable division of the marital assets.

**[\*9]** million with proceeds payable upon his death.[15] Petitioner and Dr. Moon also executed a document titled "Modification of Agreement", pursuant to which petitioner promised to repay a loan of $1.1 million with interest over the course of five years.[16] This document, signed by both petitioner and Dr. Moon, was accompanied by a mortgage securing the entire loan amount. The mortgage was collateralized by property owned by petitioner and signed by both petitioner and Dr. Moon, and their signatures were notarized.[17]

On April 18, 2006, petitioner filed with the divorce court an application to withdraw from his representation of Dr. Moon; that application was granted on

---

[15]This form lists petitioner and Dr. Moon as business partners, ostensibly covering the transfers of funds occurring between December 22, 2005, and March 12, 2006. And petitioner represented Dr. Moon in the divorce proceedings until his April 18, 2006, application to withdraw was granted on May 26, 2006. Rule 1.8(a) of the Oklahoma Rules of Professional Conduct prohibits business transactions between an attorney and his client without the client's properly waiving their conflict of interest. Nothing in the record suggests that Dr. Moon waived the conflict; the Court finds that petitioner and Dr. Moon were not business partners.

[16]The balance after $300,000 was given directly to TWB was $1.1 million.

[17]Dr. Moon mailed copies of these documents to herself later that day. The envelope containing these copies was found inside a storage locker rented on behalf of Dr. Moon. The envelope was addressed to Advantage Diagnostic's mailbox, physically located at Hunter's Glen Self Storage. Hunter's Glen Self Storage was owned by GTB Properties, which was owned by petitioner. Excepting the facility manager, petitioner had the only key to the mailbox.

**[*10]** May 26, 2006. Between then and June 30, 2006, petitioner terminated his legal representation of Dr. Moon and returned her legal file without first making copies of any of the documents therein.[18] There is no evidence that petitioner returned any funds to Dr. Moon other than those paid to the divorce court.[19]

With respect to the funds petitioner received from Dr. Moon, upon the order of the divorce court he paid into the court on June 30, 2006, the initial retainer of $200,000 and on March 13, 2007, $103,517.91 of Dr. Moon's Advantage Diagnostic investment. TWB paid to the divorce court the $300,000 it received. Of the remaining $796,482.09,[20] petitioner paid to the divorce court $300,000 on April 30, 2007. This left $496,482.09 petitioner had previously received from Dr. Moon unaccounted for.

---

[18]Petitioner testified that the change of beneficiary form, the Modification of Agreement, and the mortgage were all "pro forma" without adequate explanation. His testimony was not persuasive. Each of the three documents was fully executed.

[19]Petitioner wrote receipts for the large sums of money received from Dr. Moon. His testimony that he returned these large sums of cash and checks to Dr. Moon and failed to document their return is not credible.

[20]This amount comprised $396,500 in cash ($60,000 + $164,000 + $62,500 + $110,000), $202,482.09 in checks ($2,482.09 + $200,000), and $197,500 of other funds ($107,500 + $90,000).

**[\*11]** In its lengthy and deliberative factual division of the marital assets of Drs. Lewis and Moon, the divorce court treated as assets Dr. Moon's rights under the April 11, 2006, modification of agreement and mortgage, noting in its decree of dissolution of marriage that "Mr. Smiling has testified that he does not owe any obligation under these agreements-- * * * [Dr.] Lewis should be permitted to test that assertion." The divorce court awarded to Dr. Lewis "[a]ny and all rights or claims to recover funds held or deposited by Young Moon with Mark Smiling".

On November 20, 2009, petitioner entered into a settlement agreement with Dr. Lewis on behalf of himself; A. Mark Smiling, PLLC; Smiling Bender & Rounds, P.A.; "any other law firm with whom Mr. Smiling has also affiliated"; Hunter's Glen Self Storage; and all of the listed entities' employees, attorneys, and paralegals. Although petitioner's position was that the obligation documents assigned in the decree were merely pro forma, pursuant to the settlement agreement petitioner paid Dr. Lewis a total of $500,000 as follows: $31,100 on September 25, 2009; $168,900 on September 25, 2009; and $300,000 on November 13, 2009. The settlement released the above-listed individuals and entities from liability for a number of things

> [i]ncluding all claims or rights reserved in the Agreement dated
> January 15 and 16, 2009 * * * including, without limitation, Lewis'
> rights awarded him under paragraph 16 at page 27 of the Decree of

[*12] Dissolution of Marriage, filed August 11, 2009, * * * this Settlement Agreement and Release settles and satisfies any contractual claims Lewis has or was awarded against Smiling * * * and as to any marital cash or other holdings which may have been placed in the possession of Smiling by * * * Moon.

In preparation of petitioners' 2009 Form 1040,[21] petitioner gave his accountant copies of the $31,100 and $300,000 checks, telling his accountant only that the amounts were for the "protection of the reputation and integrity of the law business". The facts relating to Drs. Lewis and Moon were not shared with the accountant. The accountant concluded that the settlement expenses were deductible as ordinary and necessary business expenses of petitioner's business as an attorney and relied on Jenkins v. Commissioner, T.C. Memo. 1983-667, for his conclusion.

Petitioner's Legal Expenses

At some point a complaint was filed against petitioner with the Oklahoma Bar Association. Petitioner hired an attorney to represent him before the bar association. As a result of the services rendered by petitioner's attorney, petitioner

---

[21]Petitioners used the services of an accountant and a CPA. Petitioner provided expense-related documentation to his accountant, who compiled various schedules of expenses. The accountant gave the schedules to petitioner's CPA, who used them to prepare petitioners' 2009 Form 1040.

[*13] received invoices, and he made payments with respect to those invoices.[22]

Petitioner showed those checks to his accountant, but the canceled checks are not part of this record.

Notice of Deficiency

In the notice of deficiency respondent disallowed the entirety of petitioners' claimed Schedule C settlement expense deduction--$331,455. The Schedule C expenses omitted $168,900 previously paid to Dr. Lewis on September 25, 2009. (Respondent opposes this claim for a deduction for additional settlement expenses of $168,900.) Petitioners also claimed legal and professional fee expenses of $69,830. Respondent disallowed $20,281, which petitioner claims is the amount paid to his attorney with respect to the Oklahoma Bar Association complaint.

OPINION

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayers bear the burden of proving those determinations erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace. The taxpayers bear the burden of proving that reported business expenses were actually paid and were

---

[22]Petitioner's attorney did not testify in this case. Instead, petitioner introduced an affidavit dated March 17, 2014. The petition in this case was not filed with the Court until August 2014.

[*14] "ordinary and necessary". Sec. 162(a); Rule 142(a). Necessary expenses are those that are "appropriate and helpful" to the taxpayers' business; ordinary expenses are those that are common or frequent in the type of business in which the taxpayer is engaged. Deputy v. du Pont, 308 U.S. 488, 495 (1940); Welch v. Helvering, 290 U.S. at 113.

The taxpayers also bear the burden of substantiating the expenses underlying their claimed deductions by keeping and producing records sufficient to enable the Commissioner to determine the correct tax liability.[23] Sec. 6001; INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), (e), Income Tax Regs. The failure to keep and present accurate records counts heavily against the taxpayers' attempted proof. Rogers v. Commissioner, T.C. Memo. 2014-141, at *17.

In the event that the taxpayers establish that they paid a deductible expense but are unable to substantiate the precise amount, the Court may approximate the amount of the deduction, bearing heavily against the taxpayers whose inexactitude is of their own making. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). The Court must, however, have evidence sufficient to provide a basis upon which

_____

[23]Petitioners do not contend, and the evidence does not establish, that the burden of proof shifts to respondent under sec. 7491(a) as to any issue of fact.

[*15] an estimate can be made. <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-743 (1985).

There is no doubt that petitioner carried on a business and incurred expenses pertaining to it during 2009. But petitioners must show that the reported expenses were ordinary and necessary expenses to that business; they must also substantiate their expenses. The Court summarizes its findings in the following paragraphs.

A.    <u>Settlement-Agreement-Related Expenses</u>

Petitioners argue that the settlement payments were made to protect Mr. Smiling's professional reputation and his ability to represent some of his current clients, who require that he maintain a certain professional rating. Petitioners contend that because Mr. Smiling made the settlement payments to Dr. Lewis, they could not have been repayments. Respondent disagrees, arguing that the settlement expenses were merely a repayment of Dr. Moon's funds received by petitioner. The Court agrees with respondent.

Petitioners are correct that an amount paid for protection of one's professional reputation can be an ordinary and necessary expense. <u>See</u> <u>Milbank v. Commissioner</u>, 51 T.C. 805, 818 (1969). However, it is a non sequitur to jump to a conclusion regarding whether the $500,000 paid to Dr. Lewis pursuant to the settlement agreement was a repayment. Generally "[d]eductions are not permitted

**[\*16]** on account of the repayment of loans." <u>Crawford v. Commissioner</u>, 11 B.T.A. 1299, 1302 (1928). But outside the framework of bona fide loans, repayments can--in limited circumstances--be deductible. <u>See, e.g.</u>, <u>Jenkins v. Commissioner</u>, T.C. Memo. 1983-667 (addressing the deductibility of payments made by a taxpayer on behalf of another person for amounts the taxpayer was not obligated to repay). As a prerequisite to deducting repayments to customers, taxpayers bear the burden of proving that the amounts repaid were reported as income. <u>See</u> <u>Patel v. Commissioner</u>, T.C. Memo. 2012-9.

Petitioner received $1.4 million from Dr. Moon.[24] Petitioners have not shown or suggested that they reported any of this money as income. Petitioners have shown, however, that petitioner paid $300,000 directly to TWB and that TWB repaid those funds to the divorce court. What is left to evaluate is the remaining $1.1 million petitioner received.

It was not a coincidence that on the same day petitioner completed the change of beneficiary form, he and Dr. Moon executed two other documents. The first was a modification of agreement, pursuant to which petitioner agreed to repay a loan of $1.1 million with interest over the course of five years. This document

---

[24]Petitioner properly completed a change of life insurance beneficiary form in that exact amount, had his and Dr. Moon's signatures witnessed, and gave the only copies to Dr. Moon.

**[\*17]** was accompanied by a notarized mortgage, securing the entire loan amount, and collateralized by property petitioner owned.

Petitioners suggest that these documents were merely pro forma--they were mock documents not intended to be enforceable.[25]  They further suggest that all of the remaining funds received from Dr. Moon were repaid--either directly to Dr. Moon or through the divorce court.  But they ask this Court to find as fact that petitioner, a seasoned and knowledgeable attorney, prepared and executed "pretend" documents which, if filed, would actually make him liable to Dr. Moon for $1.1 million; they ask the Court to find that notwithstanding this fact, petitioner gave to Dr. Moon every copy of these documents and retained no records whatsoever; and they ask the Court to find that when returning hundreds of thousands of dollars to Dr. Moon, petitioner neither prepared nor requested receipts of any kind.

These explanations are incredible.  It cannot be coincidence that the funds under petitioner's control and the amount of indebtedness listed in the modification of agreement and mortgage are identical--$1.1 million.  Of this amount, petitioner paid $603,517.91 to the divorce court, leaving $496,482.09

---

[25]To support this assertion, petitioner testified that the property securing the mortgage was worth only $6,000, but he offered no support for this valuation.

[*18] unaccounted for. The divorce court recognized this fact and awarded Dr. Moon's right to sue petitioner for the $496,482.09 balance to Dr. Lewis. Rather than attempt to prove that the modification of agreement and mortgage were pro forma or worthless, petitioner decided to settle the issue privately with Dr. Lewis.

The settlement agreement contains plenty of legalese and formal boilerplate, but it is easy to connect the settlement amount of $500,000 with the unaccounted-for $496,482.09.[26] Petitioners suggest that because the funds belonged to Dr. Moon, the payments to Dr. Lewis could not be a "repayment". This semantic argument fails because the funds were actually repaid as modified by the divorce court in the equitable distribution of marital assets. Accordingly, $496,482.09 was clearly a repayment that is not deductible. The remaining $3,517.91 of the settlement payments might have been an ordinary and necessary business expense for protecting his reputation, but petitioner failed to show whether and to what

---

[26]There is no record of interest being paid with respect to the promissory note from Advantage Diagnostic or with respect to the modification of agreement between 2005 when the funds were placed under petitioner's control and 2009 when petitioner gave them to Dr. Lewis.

[*19] extent he was entitled to deduct any of that amount.[27] The balance is not deductible either.

Petitioners have further failed to explain or substantiate in any way the remaining $355 of reported settlement expenses.[28] Accordingly, respondent's disallowance of petitioners' 2009 claimed settlement expense deduction is sustained; petitioners' request for additional settlement expense deductions is denied.

B.    Legal Fees

Irrespective of whether petitioner's legal fees were ordinary and necessary, those expenses--to be deductible--must have been paid during the year in issue, and they must be properly substantiated. For 2009 petitioner reported on the Schedule C legal and professional fees of $69,830; respondent disallowed any deduction for $20,281 of that amount.

---

[27]The settlement agreement includes the rights of petitioner; A. Mark Smiling, PLLC; Smiling Bender & Rounds, P.A.; "any other law firm with whom Mr. Smiling has also affiliated"; Hunter's Glen Self Storage; and all of the listed entities' employees, attorneys, and paralegals.

[28]Petitioners claimed deductions of $331,455 on their 2009 Form 1040; they claim additional deductions of $168,900 in their petition, which represents one of the settlement payments made by petitioner. But the sum of these amounts-- $500,355--exceeds the total paid to Dr. Lewis by $355.

[*20] Petitioner credibly testified that he incurred legal fees as a result of a complaint filed against him with the Oklahoma Bar Association. The record includes an affidavit from his attorney corroborating the existence and scope of their relationship. It states in pertinent part: "All invoices submitted by my office and payments made by A. Mark Smiling, PLLC, were for professional services rendered in connection with Mr. Smiling maintaining his practice of law and operation of his law firm, A. Mark Smiling, PLLC." Conspicuously missing are details surrounding the timing and amounts of those invoices and payments. Also absent from the record in this case are the invoices, the canceled checks, accounting records relating to these amounts, and bank statements of petitioner's law firm.[29]

Petitioners suggest that showing canceled checks to their accountant, who provided a summary schedule to their tax return preparer, is sufficient to substantiate the amounts paid for the disallowed portion of the deduction for legal fees. They are incorrect. A trial before this Court is a proceeding de novo; the determination of petitioners' tax liability must be based on the record before this Court and not on any records used at the administrative level. Davis v.

---

[29]The record contains only two bank statements. Both are of petitioner's IOLTA account; neither is for the year at issue.

[*21] <u>Commissioner</u>, 65 T.C. 1014, 1022 (1976). And whether petitioners provided documents to their accountant to prepare their tax return is immaterial. Missing from the record in this case are any books and records containing mention of these legal fees, copies of canceled checks, or any other specific reference to dates and amounts paid with respect to petitioner's representation before the Oklahoma Bar Association.

Since the record includes no corroboration of the amounts or dates of payment of petitioner's legal expenses, the Court finds that petitioner's uncorroborated testimony is insufficient to substantiate the $20,281 respondent disallowed.[30] See <u>Higbee v. Commissioner</u>, 116 T.C. 438, 445 (2001).

C.    <u>Penalty</u>

The Code imposes a 20% penalty on the portion of any underpayment of tax attributable to "[n]egligence or disregard of rules and regulations" or "[a]ny substantial understatement of income tax." Sec. 6662(a) and (b)(1) and (2). Negligence includes "any failure to make a reasonable attempt to comply" with the internal revenue laws. Sec. 6662(c). An understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be

---

[30]Even with the <u>Cohan</u> rule, petitioners have provided no evidence upon which to approximate allowable expenses beyond the amount respondent allowed. See <u>Cohan v. Commissioner</u>, 39 F.2d 540, 543-544 (2d Cir. 1930).

[*22] shown on the return. Sec. 6662(d)(1)(A). Under section 7491(c), the Commissioner bears the burden of production with respect to the liability for any penalty. See Higbee v. Commissioner, 116 T.C. at 446. Once the Commissioner satisfies his burden, the burden shifts to the taxpayers to prove that the penalty does not apply. Id. at 447.

Respondent met his burden of production for the substantial understatement penalty[31] here by showing that petitioners (1) claimed a deduction for settlement expenses to which they were not entitled and (2) were unable to substantiate the legal expenses underlying the disallowed deduction.[32] The burden of proof thus shifts to petitioners.

---

[31]Although respondent asserted negligence in the alternative, the Court need not address it with respect to the settlement expenses. Respondent did not make a negligence argument with respect to the claimed deduction for legal fees. That argument is deemed conceded. See Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003) (holding that arguments not addressed in posttrial brief may be considered abandoned); Leahy v. Commissioner, 87 T.C. 56, 73-74 (1986) (finding concession by failure to argue).

[32]With respect to the amounts petitioners conceded, see supra note 2, respondent has also met his burden of production. Petitioners do not address the portion of the sec. 6662 penalty attributable to these amounts. That argument is deemed conceded. See Mendes v. Commissioner, 121 T.C. at 312-313 (holding that arguments not addressed in posttrial brief may be considered abandoned); Leahy v. Commissioner, 87 T.C. at 73-74 (finding concession by failure to argue). Therefore the sec. 6662 penalty applies to the portion of petitioners' underpayment attributable to these concessions.

**[*23]** The section 6662 penalty does not apply to any portion of an underpayment if the taxpayers acted with reasonable cause and in good faith with respect thereto. The taxpayers bear the burden of proving reasonable cause and good faith. Id. at 444-447. The decision whether the taxpayers acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Reasonable cause and good faith can be shown by reasonable, good-faith reliance on the advice of a qualified tax professional. See id. But generally, the most important factor is the taxpayer's effort to assess his or her correct tax liability; other factors include the taxpayer's experience, knowledge, and education. Id.

In determining whether a taxpayer reasonably relied on professional advice for this purpose, the Court applies a three-prong test which asks whether: (1) the adviser was a competent professional who had sufficient expertise to justify the reliance;[33] (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000),

---

[33]Respondent did not dispute the qualifications of petitioners' accountant. This issue is deemed conceded. See Mendes v. Commissioner, 121 T.C. at 312-313 (holding that arguments not addressed in post-trial brief may be considered abandoned); Leahy v. Commissioner, 87 T.C. at 73-74 (finding concession by failure to argue).

**[*24]** aff'd, 299 F.3d 221 (3d Cir. 2002); Van der Lee v. Commissioner, T.C. Memo. 2011-234, slip op. at 33 (citing Neonatology's test and finding that the taxpayers "failed to provide * * * [their accountant] with all relevant information" necessary to accurately report their charitable contributions), aff'd, 501 F. App'x 30 (2d Cir. 2012). Reliance on professional advice may constitute reasonable cause and good faith, but "it must be established that the reliance was reasonable." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd on another issue, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991).

Petitioners argue that they reasonably relied on their accountant to prepare the schedules for their CPA, who prepared their return for the year in issue and that this reliance constitutes reasonable cause and good faith.[34] As it relates to the

---

[34]Petitioners argue in the alternative that they made adequate disclosure of the settlement expenses by claiming the deduction on their Schedule C. To satisfy the adequate disclosure standard of sec. 6662(d)(2)(B)(ii), taxpayers must disclose the relevant facts on a properly completed form attached to the return or to a qualified amended return. Sec. 1.6662-4(f)(1), Income Tax Regs. For disclosure to be adequate, it "must be sufficiently detailed to alert the Commissioner and his agents as to the nature of the transaction so that the decision as to whether to select the return for audit may be a reasonably informed one." Estate of Fry v. Commissioner, 88 T.C. 1020, 1023 (1987). Although adequacy of disclosure is judged using a reasonable person standard, Highwood Partners v. Commissioner, 133 T.C. 1, 21-22 (2009), petitioners did nothing more than report the settlement expenses on their Schedule C. This does not rise to the level of adequately apprising the Commissioner of the nature of the settlement. See id. at 21 ("The disclosure must be more substantial than providing a clue that would intrigue the

(continued...)

[*25] reported settlement expenses, their argument fails because there is no credible evidence in the record that petitioners provided to their accountant documents relating to Dr. Moon's divorce, the receipts and promissory notes, or the information underlying any of these documents. With respect to the reported legal expenses, the Court finds that petitioners have shown reasonable cause and good faith. These conclusions are discussed in more detail below.

Although preparation of a taxpayer's return by an accountant does not provide absolute protection against substantial understatement or negligence penalties, in some circumstances a taxpayer's reliance on a competent and experienced accountant in the preparation of the taxpayer's return may constitute reasonable cause and good faith. To show good faith reliance, however, "the taxpayer must establish that the return preparer was supplied with all necessary information and the incorrect return was a result of the preparer's mistakes." Weis v. Commissioner, 94 T.C. 473, 487 (1990); see also Westbrook v. Commissioner, 68 F.3d 868, 881 (5th Cir. 1995), aff'g T.C. Memo. 1993-634; Enoch v. Commissioner, 57 T.C. 781, 802 (1972) ("The ultimate responsibility for a correct

---

[34](...continued)
likes of Sherlock Holmes but need not recite every underlying fact.").

**[\*26]** return lies with the taxpayer, who must at least furnish the necessary information to his agent who prepared the return.").

Petitioner did not provide to his accountant any documents or information relating to Dr. Moon's money; he did not discuss the modification of agreement or the mortgage; and he did not discuss Dr. Moon's divorce proceedings. And there is no evidence that petitioner's accountant discussed the impact of these types of facts upon the deductibility of the claimed settlement expense deduction. Accordingly, the Court concludes that petitioners have failed to show that they provided their accountant necessary and accurate information. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 100. For this reason alone, petitioners have failed to show that they had reasonable cause for claiming the settlement expense deduction.[35]

---

[35]This alone is sufficient to disqualify petitioners from the reasonable cause and good faith defense to the sec. 6662 penalty. But even if the Court were to assume (as it does not) that petitioners provided to their accountant all of these documents and evidence, there is nothing in the record showing that their accountant considered or advised them of the implications of their particular situation. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 100 (2000) ("The mere fact that a certified public accountant has prepared a tax return does not mean that he or she has opined on any or all of the items reported therein.").

[*27]  With respect to the claimed legal fees, however, the Court is faced with a different situation.  Petitioners contend that they had reasonable cause and good faith for their claimed legal and professional services expense deduction.

"[T]he most important factor" in determining whether taxpayers have reasonable cause for their tax treatment and whether they act in good faith "is the extent of the taxpayer[s'] effort to assess the taxpayer[s'] proper tax liability." Sec. 1.6664-4(b)(1), Income Tax Regs.  Petitioners have provided sufficient evidence to show that at the time they filed their 2009 Form 1040, they had reasonable cause and good faith with respect to this deduction.

It is clear that a complaint was filed against petitioner with the Oklahoma Bar Association.  Petitioner retained counsel, and the canceled checks for the attorney's fees were provided to petitioner's accountant.  Petitioner also provided documents to his accountant supporting the rest of his claimed legal and professional services expenses.  And petitioners' 2009 Form 1040 reflected those legal and professional services expense receipts shown to petitioners' accountant.

Although petitioner failed to substantiate to this Court the amounts paid, his credible testimony on this point--combined with the credible testimony of his accountant and the affidavit of petitioner's attorney--convinces the Court that at the time they filed their 2009 Form 1040, petitioners had reasonable cause and

**[*28]** good faith for the legal and professional services expense deduction claimed. Therefore the section 6662(a) penalty does not apply to the portion of petitioners' underpayment attributable to the disallowed legal and professional services deduction.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.